J-A18044-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| T.B. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| C.M.W. NOW C.M.P. | : | |
| | : | No. 364 WDA 2020 |
| v. | : | |
| | : | |
| M.L.B. AND J.R.B. | : | |
| | : | |
| Appellants | : | |

Appeal from the Order Entered February 5, 2020
In the Court of Common Pleas of Cambria County Civil Division at No(s):
2014-177

BEFORE:  BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    FILED SEPTEMBER 16, 2020

M.L.B. and J.R.B. (Paternal Grandparents) appeal from the order granting shared legal custody of the minor child, J.M.B. (Child), to her parents, T.B. (Father) and C.M.P. (Mother), primary physical custody to Father, shared partial physical custody to Paternal Grandparents and Mother, and granting Father's petition for relocation.[1]  We affirm.

The trial court thoroughly and accurately discussed the factual and procedural history of the case in its opinions, entered January 15, 2020, and April 6, 2020, and we adopt both histories herein.  Trial Ct. Op., 1/15/20, 1-

_____

[1] Mother has not separately appealed the custody order, nor has she filed a brief in the instant appeal.

39; Trial Ct. Op., 4/6/20, at 1-15. Pertinent to this appeal, we note the following. Mother and Father, who never married, were in a relationship from 2010 until either late 2012 or early 2013. Mother became pregnant in early 2011 and gave birth to Child in November 2011, when Father was seventeen years old and Mother was twenty-one years old. Prior to Child's birth, in August 2011, Father had enlisted in the United States Army Reserve with Mother's support. At that time, Mother lived in her own apartment and worked at a local bar. Father lived part-time with Mother and part-time with Paternal Grandparents, and Father worked five days a week at a drug store while attending college online.

At first, Father watched Child on the weekends while Mother worked. However, after Mother found Father asleep while Child was in her swing with a soaked diaper, Mother began to utilize Paternal Grandparents for childcare. While Paternal Grandparents at first provided child care in their home, the arrangement gradually transitioned to Child living full-time with Paternal Grandparents due to Mother's and Father's schedules.

Father attended Army Reserve basic training from July 2012 through October 2012, and, during this time, Child mostly lived with Paternal Grandparents. After Father returned from reserve basic training, his relationship with Mother deteriorated and, at some time between December 2012 and January 2013, Father and Mother ended their relationship. Father and Child moved in with Paternal Grandparents, who continued to care for Child while Father worked. Mother worked late hours at a bar and saw Child

twice a week when she was not working. In 2014, Mother began dating C.P. (Stepfather) and spending less time with Child.

Father, meanwhile, began planning to enlist in the active duty Army, and on January 12, 2014, Father and Mother agreed to a custody consent order in anticipation of Father's enlistment. Custody Consent Order, 1/21/14, at 1. The consent order granted Father and Mother shared legal custody and Mother primary physical custody, with Father having visitation as mutually agreed.[2] Id.

In May 2014, Father, who was at the time twenty years old, enlisted in the active duty Army, with his initial contract ending in October 2019. Paternal Grandparents encouraged Father's enlistment, and Father believed that Paternal Grandparents would return Child to him when he was stable and settled.

Father attended active duty basic training in Georgia in October 2014, and returned to Pennsylvania for Christmas in 2014. Father then attended and graduated Basic Airborne School in Georgia in January 2015. Father was then stationed in North Carolina.[3] Since joining the active duty military,

_____

[2] The consent order, in a "background" section, acknowledged that Child has "always been in the care of" Paternal Grandparents during Father's and Mother's absences. Custody Consent Order, 1/21/14, at 2. On January 27, 2014, Mother and Father filed an Amended Custody Consent Order that, among other things, eliminated the "background" section. Amended Custody Consent Order, 1/27/14, at 2.

[3] Both Father and Paternal Grandmother testified that the Army did not permit single parents to have custody of children. N.T., 10/31/19, at 9.

Father has paid $565 per month in private child support to Paternal Grandparents.

In April 2015, Mother and Stepfather had a daughter of their own. In May 2015, Father married J.R. (Stepmother). In November 2016, Mother and Stepfather moved to Indiana, and they married in March 2018.

On March 16, 2017, Father initially filed a petition for modification of the custody, and, in response, Paternal Grandparents filed a petition for leave to intervene. On March 29, 2017, Father filed an affidavit of service of a notice of relocation.[4] On April 6, 2017, Paternal Grandparents objected to Father's proposed relocation and Father's request to modify the custody order. However, by letter dated April 3, 2017, Father withdrew his petition for modification, and on May 8, 2017, Paternal Grandparents filed a praecipe to withdraw their petition for leave to intervene. From June 2017 to March 2018, Father deployed to Afghanistan.

On May 2, 2018, Father filed the petition for modification of the custody order that gave rise to this appeal. Paternal Grandparents filed a petition for leave to intervene. By letter dated June 19, 2018, Father requested a hearing before the trial court. On July 17, 2018, the parties consented to Paternal Grandparents' intervention in the action, and on August 8, 2018, Paternal Grandparents filed an answer and counterclaim. A pretrial conference was held on August 9, 2018.

_____

[4] The relocation was to North Carolina, where Father was stationed.

On November 1, 2018, Paternal Grandparents filed a motion for appointment of a guardian ad litem (GAL) for Child pursuant to Pa.R.C.P. 1915.11-2. On December 13, 2018, following oral argument, the trial court denied the motion.

The trial court convened hearings on the various petitions on December 14, 2018, March 4, 2019, and March 5, 2019. On December 14, 2018, Father testified on his own behalf, and presented the testimony of Army Sergeant K.J., II, Father's senior non-commissioned officer (NCO); S.L., a police officer and a friend of Father's and Stepmother's; and Army Specialist D.M. At the conclusion of the December 14, 2018 hearing, the trial court asserted that Child should attend counseling, but indicated that it did not need a counselor to testify.

At the hearing on March 4, 2019, the parties entered into an agreement that Child's counselor would not testify. Thereafter, Father presented the testimony of Stepmother and T.R., Stepmother's mother. That same day, Paternal Grandmother began her testimony. On March 5, 2019, Paternal Grandmother concluded her testimony, and Mother testified on her own behalf.

On March 6, 2019, the trial court issued an interim opinion and order, without prejudice, that addressed "Paternal Grandmother's apparent efforts to manipulate Child and alienate her from Father," directed all parties to refrain from disparaging the others in front of Child, and directed Child's counselor to seek input from Mother and Father before continuing Child's

counseling. See Trial Ct. Op., 1/15/20, at 5. Additionally, the trial court ordered that the counselor would not testify on behalf of any party or Child. Paternal Grandparents filed a motion for reconsideration of the interim order requesting that the trial court permit Child's counselor to testify or appoint another counselor to testify. Mot. for Modification & Recons. of the Interim Order, 3/14/19, at ¶¶ 12-13. On March 25, 2019, the trial court denied Paternal Grandparent's motion for reconsideration.

Father re-enlisted in the Army in March 2019.[5] The trial court conducted an additional hearing on April 18, 2019. At that hearing, Paternal Grandparents presented the testimony of Paternal Grandfather; G.L., Child's Sunday school teacher; A.R., Paternal Grandparents' neighbor; N.L.P., Paternal Grandparents' next-door neighbor; and H.H., a family friend of Paternal Grandparents.

By interim order on May 17, 2019, the trial court provided the parties with a summer custody schedule where Paternal Grandparents would exercise custody until June 15, 2019; Mother would exercise custody from June 15, 2019 to July 13, 2019; and Father would exercise custody from July 13, 2019, to August 19, 2019. Order, 5/17/19, at 1.

---

[5] Father currently resides in Cameron, North Carolina, with Stepmother and their two biological sons, L.B. (born August 2017) and C.B. (born September 2019). N.T., 10/31/19, at 18, 89. He is a staff sergeant, serving as a combat engineer and squad leader with an Airborne Division. N.T., 12/14/18, at 4, 67.

The trial court held an additional hearing on July 15, 2019, at which time Paternal Grandparents presented the testimony of P.H., Paternal Grandmother's mother; C.B., Paternal Grandparents' daughter and Father's sister; and Paternal Grandmother's testimony on recall. Following the hearing, the trial court issued an interim order transferring primary physical custody of Child to Father, without prejudice. Order, 7/16/19, at 1. The trial court directed Father to enroll Child in school in North Carolina. Id.

The trial court held the final evidentiary hearing on October 31, 2019, which included the continued cross-examination of Paternal Grandmother, as well as additional testimony from Father and Paternal Grandfather.

On November 15, 2019, the trial court extended the deadline to render its decision as required by Pa.R.C.P. 1915.4(d), due to the fact that the court reporter had not completed two of the six required transcripts.

On January 15, 2020, the trial court issued its custody order, awarding Father primary physical custody, and awarding Mother and Paternal Grandparents partial physical custody as mutually agreed upon. Order, 1/15/20, at 1. The court afforded the parties thirty days to negotiate partial custody schedules, including holidays, vacations, and other logistical issues, for Mother and Paternal Grandparents. Id. However, when the parties could not reach an agreement, the trial court issued its February 4, 2020 order, providing said schedule. Order, 2/4/20, at 1.

Paternal Grandparents timely filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a responsive Rule 1925(a) opinion.

On appeal, Paternal Grandparents raise the following issues for our review:

> 1. Whether the trial court erred in not appointing a [GAL] for [Child]?
>
> 2. Whether the trial court erred in precluding [Paternal Grandparents] from presenting relevant evidence from [Child's] counselor?
>
> 3. Whether the trial court erred in not appropriately considering and/or giving the appropriate weight to the testimony of [Child]?
>
> 4. Whether the trial court committed an abuse [of] discretion in making the determination that the Paternal Grandparents prevented [Father] from developing and maintaining a relationship with [Child]?

Paternal Grandparents' Brief at 4 (some formatting altered).

## Appointment of GAL

Paternal Grandparents first argue that the trial court erred in denying their motion to appoint a GAL for Child. Paternal Grandparents' Brief at 13. Paternal Grandparents contend that a GAL was required to ensure that the needs and welfare of Child would be actively advanced by an advocate who owed loyalty only to her. Id. at 14. Further, Paternal Grandparents note that the trial court relied on upon case law that predated the adoption of Pa.R.C.P. 1915.11-2, and that the current rule does not state an extraordinary circumstances standard for appointing a GAL. Id. at 16 (citing Moorman v.

- 8 -

Tingle, 467 A.2d 359 (Pa. Super. 1983) and C.W. v. K.A.W., 774 A.2d 745 (Pa. Super. 2001)).  Paternal Grandparents assert, in the alternative, that Moorman and C.W. supported their request for the appointment of a GAL due to extraordinary circumstances.  Id. at 16-17.  Lastly, Paternal Grandparents contend that the trial court erred when it considered their request to be a means of delaying the custody proceeding.  Id. at 17.

Father counters that the trial court properly denied Paternal Grandparent's request for the appointment of a GAL.  Father asserts, in part, that the instant case is analogous to Moorman and distinguishable from C.W. Father's Brief at 18.  Father adds that there was no evidence that the appointment of a GAL "would have had any impact on [the t]rial [c]ourt's ultimate decision to award primary custody to Father."  Id. at 23.  Father notes that the trial court was able to determine Child's preferences without a GAL.  Id. at 16 & n.2.

The appointment of a guardian lies within the sound discretion of the trial court.  Estate of Haertsch, 649 A.2d 719, 720 (Pa. Super. 1994). "Discretion must be exercised on the foundation of reason.  An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will."  In re Duran, 769 A.2d 497, 506 (Pa. Super. 2001) (internal citations and quotations omitted).

The Pennsylvania Rules of Civil Procedure, as well as the Domestic Relations Code, permit the court to appoint a GAL to represent the best

interests of a child in a custody action.[6]  Pa.R.C.P. 1915.11-2; see also 23 Pa.C.S. § 5334.  "A [GAL] is appointed by the court to represent a minor child in particular litigation.  The function of the guardian is to represent and protect unrepresented minors and their interests."  C.W., 774 A.2d at 748-49 (citations omitted).

This Court has further observed that "appointment of a GAL in a custody matter is not mandatory."  M.B.S. v. W.E., ___ A.3d ___, 2020 PA Super 118, 2020 WL 2537058, at * 5 n.6 (Pa. Super. filed May 19, 2020).  Moreover,

> a [GAL] is not normally appointed in custody cases involving natural parents.  A [GAL] is a person appointed by the court to

_____

[6] Pennsylvania Rule of Civil Procedure 1915.11-2 states, in relevant part:

> (a) The court may, on its own motion or the motion of a party, appoint a guardian ad litem to represent the best interests of the child in a custody action.  The guardian ad litem shall be a licensed attorney or licensed mental health professional.  The guardian ad litem shall not act as the child's counsel or represent the child's legal interests.  Prior to appointing a guardian ad litem, the court shall make a finding that the appointment is necessary to assist the court in determining the best interests of the child.
>
> *    *    *
>
> (c) The guardian ad litem shall file of record and provide copies of any reports prepared by the guardian ad litem to each party and the court not later than 20 days prior to trial.  The admissibility of the report shall be determined at the hearing.  Prior to disclosure to the parties of confidential information prohibited by 23 Pa.C.S. § 5336, the court shall make a determination of whether the information may be disclosed.  The guardian ad litem shall attend all proceedings and be prepared to testify.  The guardian ad litem shall be subject to cross-examination if called to testify by either party or the court.

Pa.R.C.P. 1915.11-2(a), (c).

represent a minor child's interest in particular litigation before the court. The appointment of a [GAL] is generally reserved for those actions where the trial court deems it necessary because the child's interest may be adversely [a]ffected, e.g., adoptions. However, in custody cases involving natural parents, despite the bitterness of each party towards each other, both parties are focused on the best interests of the child. Moreover, in a custody case, the trial court is obliged to ascertain the child's best interest.

C.W., 774 A.2d at 748 n.3 (determining that, since both parties and the trial court are focused on child's best interests, the appointment of a GAL would not be proper absent extraordinary circumstances, and that bitterness between the parties ordinarily does not rise to the level of extraordinary circumstances needed for an appointment of a GAL).

Instantly, at the December 13, 2018 hearing on the motion to appoint a GAL, Paternal Grandparents' counsel argued that a GAL was necessary because the case was complicated, Child had strong opinions, and Child had strong attachment to Paternal Grandparents. N.T., 12/13/18, at 2-3. Specifically, Paternal Grandparents' counsel asserted that a GAL should "come in and talk to everybody and then issue a report to the [trial court] outlining what they believe is in [Child's] best interest." Id.

The trial court noted that trial was scheduled to start the next day and expressed its concern that trial would be delayed. Id. at 3-4. The following exchange then took place:

THE COURT: [Y]ou say, well, this is a complex case. You know, the [court] deals with third-party cases all the time[,] that it's no longer unusual or out of the ordinary. So I don't know that it necessarily makes it a complex case on its face. So your reasons are this is a precocious child who has a strong opinion. How is appointing a [GAL] and delaying this in all likelihood going to help

- 11 -

me from what I would normally get in an in-camera interview with [Child]?

[Paternal Grandparents' Counsel]: I think the [GAL] would have more of a benefit of seeing her interact, seeing her -- generally speaking, you know, the [GAL] will have the benefit of going to the home if she chooses to or having the child come to her office but spending more time with her than just an in-camera interview. I mean, as [the court] is aware[,] we're normally tasked with having the availability to spend that time that sometimes we won't get in camera . . .

Id. at 5.

At the conclusion of the hearing, the trial court stated:

At this time, based on the arguments that have been presented, I don't find that there is sufficient reason to either delay this matter or add a [GAL]. . . .

. . . I don't think there has been any demonstration through argument that any of the parties have anything other than the [Child's] best interest at heart and it will not be the first time that I have heard from a precocious or opinionated young person. So I am going to deny [Paternal Grandparents' motion for the appointment of a GAL] at this time.

Id. at 18.

The trial court subsequently explained its decision to deny Paternal

Grandparents' motion to appoint a GAL as follows:

This case is factually analogous to [Moorman] because it involves a grandparent custodian. In that case, the Superior Court failed or refused to adopt a blanket rule that third-party custody cases require the appointment of a [GAL]. To that end, in its December 13, 2018, colloquy, the [trial court] noted the prevalence of grandparent custody cases and suggested that this fact alone does not make a case "complex."

The present facts are distinguishable from [C.W.] because it is not a contest between natural parents; but the holding nonetheless applies. If all parties appear to be seeking the best interests of

- 12 -

the child -- as was the case before the [trial court] -- there is no requirement to appoint a [GAL]. As in [C.W.], the bitterness between the parties does not rise to the level of extraordinary circumstances needed for the appointment of a [GAL]. Finally, the [trial court] engaged in a thorough and lengthy interview with Child, having no difficulty eliciting Child's strongly-held preferences even without a [GAL]. For these reasons, the [trial court] did not err in refusing to grant Paternal Grandparents' request for a [GAL].

See Trial Ct. Op., 4/6/20, at 6-7 (record citations and footnote omitted).

Following our review, we find no error abuse of discretion in the trial court's decision to deny Paternal Grandparents' motion to appoint a GAL. Paternal Grandparents have not provided a reason why the case is so complicated that the trial court required assistance in determining Child's best interests. As the trial court noted, it had no difficulty eliciting Child's preference without the assistance of a GAL. See Trial Ct. Op., 4/6/20, at 6-7. Moreover, nothing in the record shows that the trial court was incapable of determining Child's best interests when making its decision on custody. Therefore, Paternal Grandparents' first issue fails. See Estate of Haertsch, 649 A.2d at 720.

### Precluded Evidence from Child' Counselor

In their next issue, Paternal Grandparents argue that the trial court erred in precluding them from presenting relevant evidence from Child's counselor. Paternal Grandparents' Brief at 18. Paternal Grandparents assert that the evidence from the counselor was relevant to the trial court's inquiry in the case and, specifically, the trial court's conclusion that Paternal Grandparents were attempting to estrange Child from Father. Id. at 19-20.

According to Paternal Grandparents, the trial court should have utilized all available evidence, particularly because the trial court did not appoint a GAL. Id. at 20. Paternal Grandparents conclude that the trial court "did not afford itself of all of the facts and circumstances which may have been available to it . . . ." Id.

Father responds that the trial court's ruling was proper under the circumstances of the case. Father emphasizes that all of the parties agreed that Child would see a counselor, but they would not call Child's counselor to testify at trial. Father's Brief at 23.

"The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court." In re K.C.F., 928 A.2d 1046, 1050 (Pa. Super. 2007) (citation omitted).

Here, the trial court observed:

On December 14, 2018, the parties agreed that Child would attend counseling with Janet Shadid of Westmont Family Counseling Ministries, but that Ms. Shadid would not testify in court. The parties believed this would reduce the likelihood of "posturing" and increase the chances that counseling would be effective. Ms. Shadid obtained background information from Paternal Grandparents, not from Father. Father objected that the counselor had received a one-sided characterization of the parties' circumstances. At the hearing on March 4, 2019, Paternal Grandparents attempted to introduce a report from Ms. Shadid in violation of their agreement. The [trial court] denied their request, stating, "insamuch as we had all agreed that Miss Shadid would not testify so that we could ensure that nobody was posturing for the sake of the counseling, I am going to deny the request to have her testify."

> In its Interim Order dated March 6, 2019, the [trial court] confirmed the parties' agreement, ordering that "[t]he counselor shall not testify on behalf of any party or the child." The [c]ourt also directed that, if Child "continues in counseling with Janet Shadid of Westmont Family Counseling Ministries, the counselor shall first seek input from Mother and Father."
>
> The [trial court] abided by the parties' agreement that the counselor would not testify at trial. Paternal Grandparents cannot disregard the agreement simply because they will ostensibly benefit from something the counselor reports.

See Trial Ct. Op., 4/6/20, at 10 (record citations omitted).

Paternal Grandparents do not address the agreement in their brief but, instead, argue that the court should have considered the counselor's report regardless. As the admission of evidence is within the sound discretion of the trial court, and the trial court abided by the agreement of the parties, we cannot find an abuse of discretion in the exclusion of Ms. Shadid's testimony. In re K.C.F., 928 A.2d at 1050.

## Alienation

Paternal Grandparents next challenge the trial court's determination that Paternal Grandparents alienated Child from Father. Paternal Grandparents' Brief at 21-26. Specifically, Paternal Grandparents argue that the court erred in finding that they had attempted to estrange Child from Father, because they offered evidence that Father historically had not made significant efforts to spend time with Child and often failed to keep his promises to call Child. Paternal Grandparents' Brief at 26. Paternal Grandparents note that the trial court made its finding after hearing Father's testimony on the first day of trial and contend that the evidence did not

support the trial court's determination. Id. at 24. Paternal Grandparents insist that Father had misled the trial court as to his involvement and efforts to maintain a relationship with Child. Id. at 26.

Father contends that trial court "engaged in a through discussion of its determination as to the credibility of the parties." Father's Brief at 32. According to Father, Paternal Grandparents' claim that the evidence did not support the trial court's conclusion lacks merit. Id. at 36-37.

Initially, we note that the scope and standard of review in custody matters is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

> With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

M.J.M. v. M.L.G., 63 A.3d 331, 334 (Pa. Super. 2013) (citation omitted). "[W]hen making a custody award, '[t]he court shall delineate the reasons for its decision on the record in open court or in a written opinion or order.'" Id.

at 335.  The trial court must delineate its reasons at or near the time of its decision.  A.M.S. v. M.R.C., 70 A.3d 830, 835 (Pa. Super. 2013).

With regard to custody disputes between biological parents and third parties, this Court has observed that:

> The parent has a prima facie right to custody, "which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party."  Section 5327 of the Custody Act pertains to cases "concerning primary physical custody" and provides that, "[i]n any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent.  The presumption in favor of the parent may be rebutted by clear and convincing evidence."  This Court has defined clear and convincing evidence "as presenting evidence that is so clear, direct, weighty, and convincing so as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue."
>
> Accordingly, "even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side."  When making a decision to award primary physical custody to a nonparent, the trial court must "hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side."

R.L. v. M.A., 209 A.3d 391, 396 (Pa. Super. 2019) (citations omitted).

The Child Custody Act lists the factors to be considered by the court:

> (a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued

risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Instantly, the trial court thoroughly and thoughtfully discussed the sixteen custody factors in its January 15, 2020 opinion. Although Paternal Grandparents do not enumerate which factors they challenge, their arguments go to the finding and weight the trial court afforded to the first, third, seventh, eighth, ninth, and tenth custody factors.[7] We add that the trial court also

_____

[7] The trial court made findings as to relocation factors as well, which Paternal Grandparents have not expressly challenged on appeal. However, we note that when a request for relocation of the subject children along with a parent is involved, the trial court must consider all of the following ten relocation factors set forth within Section 5337(h) of the Act:

(h) Relocation factors.—In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

considered the presumption of custody in favor of Father, and determined that

Paternal Grandparents failed to rebut that presumption by clear and

_____

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h); see also C.M.K. v. K.E.M., 45 A.3d 417, 422 (Pa. Super. 2012).  We add that trial court did address all ten relocation factors.

convincing evidence. See Trial Ct. Op., 1/15/20, at 34; see also R.L. v. M.A., 209 A.3d at 396

Instantly, in its discussion of the first and eighth factors, the trial court discussed the ways in which Paternal Grandparents had prevented Father from being part of Child's life and parenting Child. See Trial Ct. Op., 1/15/20, at 18-25, 31. For example, trial court found, and there was undisputed evidence, Paternal Grandparents had no signs of Father such as pictures in their home. Id. at 18; see also N.T., 3/4/19, at 46-50; 3/5/219, at 84-86. The trial court credited Father's testimony that Paternal Grandparents limited the place and times in which Father exercised custody of Child.[8] Trial Ct. Op., 1/15/20, at 18; see also N.T., 12/14/18, at 30-45. The trial court further credited Father's testimony that Paternal Grandparents did not facilitate Father's telephone contact with Child. Trial Ct. Op., 1/15/20, at 21-22; see also N.T., 12/14/18, at 23, 27-29, 32, 53. Specifically, Father testified that Paternal Grandparents would tell Father that Child was busy or did not want to talk, and diminished the importance of Father's phone calls against anything previously scheduled. Father also testified that Paternal Grandparents blocked

_____

[8] Specifically, the trial court credited Father's testimony that Paternal Grandparents refused to permit Father to have custody of Child outside of Paternal Grandparents' home, which prevented Father from having dinner at a friend's house or going to the zoo or a park with Child. N.T., 12/14/18, at 30, 34, 39. The trial court also credited Father's testimony that Paternal Grandparents refused to allow him to have custody for more than a few hours at a time, and until November 2016, did not let Child visit Father in North Carolina overnight. Id. at 35, 37, 42, 45.

Father's phone number in January of 2015, and thwarted Father's phone contact with Child during his deployment to Afghanistan. Trial Ct. Op., 1/15/20, at 22; see also N.T., 12/14/18, at 28-29, 50-51. Both Father and Paternal Grandparents placed Father's calls to Child on speakerphone, and Stepmother stated that she heard Paternal Grandparents whispering to Child to "hurry up" during Father's calls with Child. Trial Ct. Op., 1/15/20, at 22; see also N.T., 3/4/19, at 15-16. Paternal Grandparents also planned events during Father's visits with Child on his four-day passes and required Father to work around their schedules for Child. Trial Ct. Op., 1/15/20, at 20; see also N.T., 12/14/18, at 34-35, 46-48.

Paternal Grandparents also gave Child a GPS-tracking watch that they told her not to remove during Father's custody periods. Trial Ct. Op., 1/15/20, at 20; see also N.T., 12/14/18, at 36-37. Moreover, the trial court credited Father's testimony that Paternal Grandparents told Child that, if Father took her to North Carolina, Child would never see Paternal Grandparents again.[9] Trial Ct. Op., 1/15/20, at 20; see also N.T., 12/14/18, at 37. Child told Father

---

[9] The trial court made further findings that Paternal Grandparents (1) had Child tell Father that, if he really loved her, he "would just sign the paperwork" to give them custody, (2) refused to encourage Child to visit Father, (3) told Child that Father was asleep when she was born, (4) refused to stay in Father's home and forced Father to drive three hours every day to see Child during a visit Paternal Grandparents and Child made to North Carolina, (5) refused to allow Father to take Child to Disney World before his deployment, but then taking Child to Disney World themselves during his deployment, and (6) made Child feel guilty when she was with Father. The record supported each of these findings.

during a visit that she had to call Paternal Grandmother because Paternal Grandmother would die or be up all night crying if Child was not with her. N.T., 12/14/18, at 73.

The trial court also found incredible Paternal Grandparents' claims that they wished to maintain custody of Child until she was ten or eleven years old before transferring custody to Father. In so doing, the court considered that Father would not be able to develop a relationship with Child due to the limited opportunities afforded by Paternal Grandparents and the lack of insight Paternal Grandparents showed regarding the way their actions were negatively affecting Child. Trial Ct. Op., 1/15/20 at 23-24.

With regard to the text messages, the trial court observed:

During the trial, the parties presented snapshots of their electronic communications as exhibits. Typically, the parties would present copies of communications that depicted another party in a negative light. Early in the trial, Paternal Grandparents presented significant evidence regarding their communications with Father. Eventually, the [trial court] requested similar communications between Paternal Grandparents and Mother. The exhibits submitted in response to the [c]ourt's directive were illuminating. Instead of snapshots, the [trial court] now had a more complete record of the parties' daily interactions with one another. The totality of the communication record illustrated the stark difference in the level of cooperation between Paternal Grandparents (primarily Grandmother) and Child's parents. To Mother, Paternal Grandmother was kind and cooperative. To Father, Paternal Grandmother was curt and obstructionist.

Paternal Grandmother submitted 111 pages of text messages between Paternal Grandmother and Father for the period from August 19, 2018, to June 11, 2019. Intervenors' Exhibits 16 and 16(A) (Oct. 31, 2019). The communications are completely transactional. Paternal Grandmother offers minimal information to Father, and expresses no warmth or affection for him. On the

other hand, Paternal Grandmother's text exchanges with Mother are easygoing, loving, and conversational. See Appendix A.

Id. at 24-25.

Based on these findings, the trial court concluded:

Paternal Grandparents had ample opportunities to foster a loving relationship between Child and her active duty military Father . . . , but they failed or refused to do so. Child's testimony revealed the devastating effect of this conduct on her. See, e.g., N.T.[, 3/5/19, at 30-32] (Child loves her parents "a little"). Either Child professed limited affection for her parents to satisfy her doting grandparents, or she really has no love for Mother and Father. The ease with which Child transitioned to Father's custody suggests it was the former. This provides hope that Child can overcome Grandparents' pervasive efforts to prejudice her against Father.

Id. at 25.

Following our review, we find that Paternal Grandparents' arguments that the trial court erred in finding that they alienated Father are akin to a challenge to the trial court's weight and credibility determinations. The trial court was free to assess the weight of the evidence and make credibility determinations that were supported by the record. See M.J.M., 63 A.3d at 334. Here, the trial court considered all of the evidence presented including six days of testimony and voluminous exhibits introduced both by Paternal Grandparents and by Father. In examining the evidence and the testimony of all parties, the trial court found Father's testimony regarding Paternal Grandparents' alienation credible, and Paternal Grandparents' explanations and testimony for their conduct incredible. The record supports the trial court's findings and, therefore, those findings were soundly within the trial

court's purview. See id. Moreover, having reviewed the record, we find no basis to conclude that the trial court's conclusion that Paternal Grandparents played a role in Child's estrangement from Father was unreasonable. See id. Accordingly, we affirm the trial court's finding that Paternal Grandparents' alienation of Father was determinative of the first and eighth custody factors and relevant to the trial court's consideration of the third, ninth, and tenth custody factors.

### Child's Preferences

Paternal Grandparents also claim that the trial court improperly discounted Child's preferences based on its findings that they alienated Father and "brainwashed" Child. Paternal Grandparents' Brief at 23. Paternal Grandparents add that if the trial court had appointed a GAL or permitted to Child's counselor to testify, it would have had a more complete picture to decide all factors legitimately having an effect on Child's physical, intellectual, moral, and spiritual well-being. Id.

Father responds that the trial court properly weighed Child's preference based on the influence Paternal Grandparents had on Child. Father's Brief at 31. Father notes that the record supported the trial court's finding that Paternal Grandparents influenced over Child. Id. at 27.

With respect to Child's preferences under Section 5328(a)(7), it was undisputed that Child stated she wanted to remain with Paternal Grandparents and did not want to stay with Father. However, the trial court stated that it

considered Child's preference but will afford it little weight. It is very evident that Child has been heavily influenced by Paternal Grandparents' efforts to estrange her from Father. In short, Paternal Grandparents brainwashed Child.[fn12] Unfortunately, Child has adopted Paternal Grandparents' jaded and unfair characterization of Father's motives. To compound the problem, Paternal Grandparents refuse to acknowledge that their actions are damaging to Child. It is hard to imagine that Child will not suffer emotionally from Paternal Grandparents' systematic and pervasive alienation of her parents. For these reasons, this factor favors Father.

> [fn12] The [trial court] uses the term "brainwashed" in the layman's sense, not as a psychological or psychiatric term.

Trial Ct. Op., 1/15/20, at 30-31 (footnote in original).

Our review of the record reveals that the trial court interviewed Child in chambers on March 5, 2019, when Child was seven and a half years old. Id. at 30. As the trial court observed that

> [Child] presented with a level of maturity and intelligence slightly above her chronological age. Throughout her interview, Child expressed many of the same sentiments as Paternal Grandmother. For example, Child was unable to admit anything positive about Father; she insisted that Father could "visit" her, but not have overnights; and she expressed disdain for his frequent calls:
>
> Q[:] Why don't you want to talk to [Father]?
>
> A[:] Because he pretty much calls often and I don't like that. Like once a month or once a year would be good.
>
> Q[:] Oh, really. Why do you think that?
>
> A[:] Um, because he calls every night and I don't like it, or he says he'll call and he doesn't. So that makes him a liar but a hypocrite.

N.T. [, 3/5/20, at] 23-24.  This was just one of many heartbreaking statements made by Child.  Not surprisingly, Child expressed a strong preference to remain in Paternal Grandparents' custody.

Trial Ct. Op., 1/15/20, at 30-31 (footnote in original).

Ultimately, Paternal Grandparents take issue with the trial court's weight and credibility determinations.  However, the trial court relied upon the testimony of Father, which it found credible, and the in-camera testimony of Child.  Trial Ct. Op., 1/15/20, at 30.  Moreover, as discussed above, the record contains numerous examples of Paternal Grandparents' efforts to alienate Child from Father that supported the trial court's determination of the weight of Child's preferences.  As the court's credibility and weight determinations are supported by the record, we decline to disturb them on appeal.  See M.J.M., 63 A.3d at 334.

Lastly, to the extent Paternal Grandparents argue that a GAL or counselor could have better represented and clarified Child's best interest, we disagree.  In light of the evidence that Paternal Grandparents influenced Child's relationship with Father, which the trial court found credible, we discern no basis to conclude that the trial court erred in weighing the evidence related to Child's preferences without a GAL or additional evidence for a counselor.

### Conclusion

For the foregoing reasons, we conclude that the trial court did not err or abuse its discretion when denying Paternal Grandparents' motion to appoint a GAL, denying Paternal Grandparents' motion to permit a counselor to testify, and in granting Father's petitions for modification of custody and relocation.

There is no doubt that all parties in this appeal love Child and sought what they sincerely believed was in Child's best interest. Nevertheless, having reviewed Paternal Grandparents' arguments in light of the record and the relevant law, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/2020