J-A07011-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: D.D., D.D., AND D.D., MINORS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.D., FATHER | : | No. 1413 MDA 2020 |

Appeal from the Decree Entered October 29, 2020
In the Court of Common Pleas of Lycoming County Orphans' Court at
No(s):  6687

BEFORE:   BOWES, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                **FILED: MAY 11, 2021**

K.D. ("Father") appeals[1] from the decree entered on October 29, 2020,

which terminated involuntarily his parental rights to his three sons, D.D.1,

born in June 2012, D.D.2, born in February 2014, and D.D.3, born in August

2018.  After careful review, we affirm.

Lycoming County Children and Youth Services ("CYS") became involved

with this family on December 20, 2018, after it received a report regarding

---

[*] Former Justice specially assigned to the Superior Court.

[1] As the three children share a single orphans' court docket number, it was not necessary for Father to file multiple notices of appeal.  **Cf**. Pa.R.A.P. 341, Note ("Where . . . one or more orders resolves issues arising on **more than one docket** . . . separate notices of appeal must be filed.") (emphasis added); **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) ("[T]he proper practice under Rule 341(a) is to file separate appeals from an order that resolves issues arising on **more than one docket**.  The failure to do so requires the appellate court to quash the appeal.") (emphasis added).

D.D.3. N.T., 5/27/20, at 6-7. S.D. ("Mother") had taken D.D.3 to a doctor's office, where the staff observed that he had scratches "all over his body," and that Mother was handling him roughly.[2] *Id*. at 7-8. A CYS caseworker responded to the office, where she observed that D.D.3 also appeared malnourished. *Id*. at 11. An ambulance transported D.D.3 to the hospital, and a subsequent examination revealed that his injuries included a fractured leg and fractured ribs. *Id*. at 14-15, 30-31, 36.

Meanwhile, because the CYS caseworker was aware that Mother had other children, D.D.1 and D.D.2, she inquired where they were. *Id*. at 12. Mother claimed that a friend was watching D.D.1 and D.D.2 but responded to further questions evasively and could not provide the friend's phone number. *Id*. at 12-13. Suspecting that something was wrong, the CYS caseworker requested that a second caseworker go to Mother's home. *Id*. at 13. When the second caseworker arrived at the home, she discovered that then six-and–one-half-year-old D.D.1 and nearly four-year-old D.D.2 were there alone and appeared to have numerous injuries. *Id*. at 23-25. The home was also dirty and had safety hazards, including an axe that the children could access. *Id*.

---

[2] The orphans' court entered a separate decree terminating the parental rights of Mother, who did not appeal.

at 49-50, 55. Significantly, Father was absent throughout these events, reportedly because he was at work several hours away.[3] *Id*. at 16.

CYS obtained emergency custody of D.D.1, D.D.2, and D.D.3 that same day, December 20, 2018, and a shelter care hearing took place the following day, December 21, 2018. *Id*. at 16, 19-20, 25, 48. The juvenile court held dependency hearings on February 27, 2019 and March 19, 2019, after which it adjudicated all three children dependent, found aggravated circumstances, and relieved CYS of its duty to provide reunification efforts. *Id*. at 17, 57, 201. In addition, CYS conducted child abuse investigations, which culminated in a series of indicated and founded reports of abuse against Father.[4] *Id*. at 32-40.

Following the adjudications, CYS prepared reunification goals for Father. These goals included, among other things, preventing further abuse to D.D.1,

---

[3] The certified record reveals that Father had a prior history of involvement with child protective services, as his rights to two older children were terminated in Maryland while he was incarcerated on a drug conviction. N.T., 9/2/20, at 191-92.

[4] The certified record contains relatively little detail regarding the injuries D.D.1, D.D.2, and D.D.3 suffered, the poor conditions in Father's home, and the procedural history of the children's dependency proceedings. This is because the children's dependency records were not transmitted to this Court, since the orphans' court proceeding has a different docket number than the dependency proceedings. However this Court previously detailed the children's injuries, the poor home conditions, and the procedural history extensively in the unpublished memorandum wherein we affirmed the juvenile court's findings of child abuse and aggravated circumstances. *See In the Interest of D.D.*, 240 A.3d 906 (Pa.Super. 2020) (unpublished memorandum).

D.D.2, and D.D.3, and maintaining a bond with them. *Id*. at 204-05. While Father made progress toward these goals by completing certain programs and attending visits, he left Lycoming County at, or shortly before, the time of the children's placement and moved in with his new paramour several hours away in western Pennsylvania. *Id*. at 211-13, 224-34; N.T., 9/2/20, at 44, 137. This limited Father's ability to maintain a place of importance in the children's lives. N.T., 5/27/20, at 216-222. More critically, Father continued to deny any direct responsibility for the conditions of his former home or for the abuse D.D.1, D.D.2, and D.D.3 had suffered. N.T., 9/2/20, at 58, 171-74.

On January 28, 2020, CYS filed a petition to terminate Father's parental rights involuntarily pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The orphans' court conducted hearings on May 27, 2020, September 2, 2020, and September 15, 2020, during which it received testimony from a bevy of witnesses.[5] CYS presented the testimony of, *inter alia*, three caseworkers: Melissa Hume; Jordan McGill; and Ashley Myers, and Denise Feger, Ph.D., who performed behavioral health and bonding evaluations of Father, D.D.1, and D.D.2, and provided counseling services to D.D.1 and D.D.2. It also presented the children's foster mother, J.N. Father testified on his own behalf and presented testimony from Cory Burkholder, the Outreach caseworker, and

---

[5] D.D.1, D.D.2, and D.D.3 had the benefit of legal counsel and a guardian *ad litem* during the termination proceedings.

William Pearson, the CYS visitation supervisor. Finally, the guardian *ad litem* presented the testimony of Mother.

On October 29, 2020, the court entered a decree terminating Father's parental rights. Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal, on November 5, 2020.

Father now raises the following claims:

1. Whether the [orphans'] court erred in terminating the parental rights of [Father] pursuant to 23 Pa.C.S. § 2511(a)(1) when [Father] has not failed to perform parental duties [for] a period of at least six months and made every effort to have a relationship with his children[?]

2. Whether the [orphans'] court erred in terminating the parental rights of [Father] pursuant to 23 Pa.C.S. § 2511(a)(2) when there was insufficient evidence that the child(ren) were without essential parental care, control or subsistence necessary and causes of the incapacity cannot or will not be remedied as [Father] made substantial progress to remedy the incapacity and provide the children with essential parent care, control and subsistence necessary[?]

3. Whether the [orphans'] court erred in terminating the parental rights of [Father] pursuant to 23 Pa. C.S. § 2511(a)(5) and 23 Pa.C.S. § 2511(a)(8) in finding that (1) the child(ren) have been removed from parental care for at least six months and twelve months respectively; (2) the conditions which led to removal or placement of the children continue to exist; (3) and termination would best serve the needs and welfare of the children when [Father] has remedied the conditions and the needs and welfare of the children would not be best served by termination[?]

4. Whether the court erred in terminating the parental rights of [Father] pursuant to 23 Pa.C.S.A. §2511(b), when there is a bond between the children and [Father] and the best interests of the children would not be served by termination[?]

Father's brief at 7-8.

- 5 -

We consider Father's claims mindful of the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Pennsylvania's Adoption Act governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

. . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's rights pursuant to § 2511(a)(1), (2), (5), (8), and (b). In order to affirm the orphans' court, we need only agree with the court as to any one subsection of § 2511(a), in

addition to § 2511(b). ***In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Instantly, we analyze the court's decision under § 2511(a)(2) and § 2511 (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > . . . .
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> > . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We begin by addressing whether the orphans' court committed an abuse of its discretion by terminating Father's rights pursuant to § 2511(a)(2):

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1)

repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). As this Court has explained, § 2511(a)(2) does not apply solely to instances of affirmative misconduct but also permits termination based on a parent's incapacity. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).

Father argues that he attended visits consistently and participated in services that CYS and Dr. Feger, the bonding expert, recommended. Father's brief at 28-32, 35. He maintains that the recommended services changed over time, and that CYS provided him with inconsistent information, but that he made diligent efforts to comply, nonetheless. *Id*. at 31-33. Father insists that the mere possibility that he could have done more did not justify termination. *Id*. at 30.

The orphans' court explained its decision to terminate Father's parental rights pursuant to § 2511(a)(2) as follows, in relevant part:

> Father has admitted that he was not there for his [c]hildren when he should have been. He essentially abandoned his [c]hildren because the relationship between him and Mother was failing. Father acknowledged that he knew Mother was overwhelmed caring for three children full time and recognized that she needed help. His response, however, was to be with his mistress hours away from home. Additionally, while Father claims that he did not cause or have knowledge of the abuse to his [c]hildren, Mother has provided contradictory testimony, which the [c]ourt has found reliable. Father's unwillingness to put his [c]hildren's needs and happiness before his own contributed to

- 8 -

the lack of parental care, control, and subsistence necessary for the [c]hildre's physical and mental well-being.

Since the time the [c]hildren were taken into [CYS's] custody, Father continues to refuse to take responsibility for not only his knowledge, actions, and omissions regarding the abuse to the [c]hildren but also other shortcomings that he may have as a parent including, but not limited to, failing to be honest and forthcoming and failing to place his [c]hildren's needs before his own. Since the [c]hildren were taken into custody by [CYS], Father has not necessarily refused to perform parental duties. He has, however, refused to follow [CYS's] and Dr. Feger's recommendations regarding correcting any deficits he has in performing parental duties. [CYS] has provided Father with services and attempted to reunify him with his [c]hildren, despite a [c]ourt [o]rder stating it need not make such efforts. For almost two years, Father has failed to cooperate with [CYS] and although he states he wishes to have custody of his [c]hildren again, his statements are not enough as his actions have shown the [c]ourt that he is more interested in his own wellbeing than th[at] of his [c]hildren.

. . . .

Generally speaking, the [c]ourt understands that a parent may desire to relocate for a fresh start and that may be appropriate under normal circumstances. However, we are not dealing with a minor issue here. Rather, we are dealing with a situation where the [c]hildren had to be removed from their home due to severe physical abuse and neglect from their Mother while Father was away from the home working and spending time with his mistress. Father's attempt to start fresh is what led to the situation where the [c]hildren were abandoned and abused by their Mother who was likely experiencing a mental health episode following the birth of [D.D.3.]

Father has failed to prioritize his [c]hildren and continues to place his own needs and desires before his [c]hildren's needs. This conduct has been continuing for almost two years. Father has been given ample time and opportunities to reunite with his [c]hildren and yet has failed to do so. For these reasons, the [c]ourt finds that Father will be unable to remedy his incapacities which have prevented him from being reunified with the [c]hildren. This [c]ourt is unwilling to further delay the

- 9 -

[c]hildren's permanency based on Father's intentions to be an appropriate resource for the [c]hildren in the future. The [c]ourt finds by clear and convincing evidence that [CYS] has fulfilled 23 Pa.C.S. § 2511(a)(2) by demonstrating Father's repeated and continued incapacity and neglect has caused the [c]hildren to be without essential parental control or subsistence necessary for their physical and mental well-being.

Orphans' Court Opinion, 10/29/20, at 20-23 (emphasis omitted).

As described above, D.D.1, D.D.2, and D.D.3 entered foster care on December 20, 2018, due to the injuries and neglect they suffered in Father's prior home, as well as the poor conditions of that home. N.T., 5/27/20, at 6-15, 23-25, 30-31, 36, 49-50, 55. Although Father was absent from the home at the time of the placement, CYS's investigations culminated in indicated and founded reports of child abuse against Father. *Id*. at 16, 30-40. These reports resulted from Father's neglect of the children and failure to protect them from Mother's abuse, and from his possible or alleged participation in the abuse. *Id*. at 32-40. While CYS indicated additional reports based on Father's possible or alleged participation in the abuse, those reports did not attain founded status. *Id.* at 35-40.

Following the placement, Father made progress toward complying with his reunification goals, by completing parenting and domestic programs and attending a majority of his visits with the children. *Id*. at 204-05, 224-34; N.T., 9/2/20, at 44. However, about the time that D.D.1, D.D.2, and D.D.3 entered foster care, Father moved from Lycoming County to live with his new paramour several hours away in western Pennsylvania. Father testified that

he was living with this paramour by "the end of November, [or] beginning of December" 2018, explaining that he and Mother "were going through a rough patch and I pretty much tried to walk away from it." N.T., 9/2/20, at 137-38. Father's decision to "walk away" from his family impaired his ability to reunify with the children. As CYS caseworker Ashley Myers testified, Father's move prevented him from participating in more frequent visits with D.D.1, D.D.2, and D.D.3, which CYS recommended due to their young ages. N.T., 5/27/20, at 216-222. It also prevented him from doing things like attending many of the children's medical appointments. *Id*. at 219-22.

More significant, though, was Father's failure to accept responsibility for the abuse that D.D.1, D.D.2, and D.D.3 had suffered. During the termination hearing, Father denied that he bore any responsibility for the conditions of the home in December 2018, claiming that he had not been there since the previous November. N.T., 9/2/20, at 135, 171. Similarly, he denied that he was aware Mother was abusing the children, noting that he had observed only "little scratches and little bruises" when he saw them. *Id*. at 138. Father insisted that his sole failing was "not being there to protect them." *Id*. at 172.

The testimony of Mother and Dr. Feger contradicted Father's claims. Mother testified that Father was aware of the conditions in their home, as he visited briefly about a week before the children's placement. *Id*. at 256-58. Likewise, Dr. Feger described disclosures that D.D.1 and D.D.2 made, indicating that Father knew about Mother's abusive conduct but did nothing

to stop it, and that he engaged in abusive conduct himself. N.T., 5/27/20, at 80-81, 108-09. Given this testimony, the record supports the finding of the orphans' court that Father remains incapable of parenting D.D.1, D.D.2, and D.D.3 safely. Regardless of his initial participation in certain services, Father's failure to accept responsibility, and his continued attempts to justify his conduct prior to the children's placement in 2018, demonstrate that returning the children to his care would risk exposing them to the same abuse and neglect they endured previously. Therefore, we discern no abuse of discretion and affirm the court's decision to terminate Father's rights pursuant to § 2511(a)(2).

We next address whether the orphans' court committed an abuse of its discretion by terminating Father's rights pursuant to § 2511(b):

> [§] 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [§] 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [§] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing

- 12 -

> parent-child bond can be severed without detrimental
> effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting

***In re N.A.M.***, 33 A.3d 95, 103 (Pa.Super. 2011) (citations and quotation

marks omitted).

Father appears to challenge termination pursuant to § 2511(b) primarily

by arguing that the evidence presented during the hearing was contradictory.

Father's brief at 38-40.  He observes that Dr. Feger opined that D.D.1 and

D.D.2 have an unhealthy bond with him, and that it would be traumatic for

them to return to his care, but that she also testified that D.D.1 and D.D.2

have indicated they want to live with him, and that terminating his rights

would cause them to suffer a loss.  ***Id***. at 38-39.  Father contrasts Dr. Feger's

opinions with those of William Pearson, who supervised his visits and provided

a positive appraisal of his interactions with D.D.1, D.D.2, and D.D.3.  ***Id***. at

39-40.  He proposes that it was improper to terminate his rights because,

even if his bond with the children is unhealthy, severing it would cause the

children emotional pain.  ***Id***. at 40-41.

The orphans' court explained its decision regarding § 2511(b) as follows:

> As stated several times above, the [c]hildren's attitude,
> behavior and conduct dramatically worsens prior to, during, and
> after visits with Father.  In fact, [D.D.1] and [D.D.2] were
> reported to be relieved when they were no longer forced to have
> video calls with Father.  The [c]hildren are only physically seeing
> Father once per week.  Throughout the entirety of this case,
> Father has never had an unsupervised visit with the [c]hildren
> and, with the exception of one or two times, all visits have taken

place in a controlled setting provided by [CYS].[6]  The [c]hildren have never been to Father's home.  Dr. Feger describes Father's relationship with the [c]hildren as "artificial with a minimal bond." Dr. Feger also testified that any bond Father does have with the [c]hildren [is] unhealthy.  The [c]hildren do not feel safe with him, they do not desire to please him, they fear him, and they do not rely on him.  As the [c]ourt understands it, the [c]hildren see their visits with Father as more of an obligation rather than a chance to be with someone who they understand will support them and love them.  Rather, it is evident that the [c]hildren have a stronger bond with their foster family than with Father.  The [c]hildren are currently flourishing in their current placement and are happy, healthy, and loving young kids.  Dr. Feger has opined, and the [c]ourt agrees, that placing the [c]hildren back with Father or extending this case out even longer will be detrimental to the progress that they have made thus far.  Any bond that does exist between the [c]hildren and Father, if broken, will likely benefit the [c]hildren more than harm them.

Therefore, the [c]ourt is satisfied that termination of Father's . . . parental rights would not destroy an existing bond or cause any trauma to the [c]hildren and that permanency in the form of adoption is in the best interest of the [c]hildren.

Orphans' Court Opinion, 10/29/20, at 27-28 (citation to the record omitted).

Although Father summarizes the testimony of Dr. Feger and Mr. Pearson accurately, that testimony does not require reversal of the decree terminating his parental rights.  To the extent that Dr. Feger and Mr. Pearson contradicted each other in their appraisals of Father's bond with the children, it was within the discretion of the orphans' court to resolve that contradiction in favor of Dr. Feger.  **See N.A.M.**, **supra** at 99 ("As the ultimate trier of fact, the orphans' court is empowered to make all determinations of credibility, resolve

---

[6] The record appears inconsistent on this point, with Ms. Myers testifying that Father's visits in the community were supervised and Mr. Pearson testifying that they were unsupervised.  N.T., 9/2/20, at 69, 118

conflicts in the evidence, and believe all, part, or none of the evidence presented."). This is especially true given that Dr. Feger testified as an expert evaluator, while Mr. Pearson testified merely as a fact witness who observed Father's visits.

Moreover, Dr. Feger did not contradict herself. Dr. Feger testified that D.D.1 and D.D.2 would "grieve and experience a loss" if the orphans' court terminated Father's parental rights, and that they had indicated they wanted to live with Father.[7] N.T., 5/27/20, at 85-86, 105-06. She clarified, however, that the bond D.D.1 and D.D.2 shared with Father was not healthy and "not consistent with a parent who provided safety and security to their child during developmental ages that it was crucial for that to have occurred." *Id*. at 103-04. Dr. Feger concluded that the loss D.D.1 and D.D.2 would suffer "will be different than a child who was effectively bonded with their parents[,]" and that there would be "greater risks" in reunifying the children with Father than

_____

[7] Dr. Feger's testimony was limited in scope to D.D.1 and D.D.2, and she did not opine regarding what bond, if any, Father might share with D.D.3. N.T., 5/27/20, at 104-05. D.D.3 was about four months old when he entered foster care in December 2018 and had minimal contact with Father prior to his placement, as Father worked several hours away from home. By the time the termination hearing concluded in September 2020, D.D.3 was just over two years old, and Father had never played a significant role in his life. Under these circumstances, it is apparent that D.D.3 and Father do not share a meaningful bond. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa.Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.").

with placing them with a new, pre-adoptive foster family. [8]  *Id*. at 106; N.T., 9/2/20, at 24.

To the extent that Father contends that the likelihood that the older children might experience a sense of loss is sufficient by itself to preclude the termination of his parental rights, he is mistaken.  It was the duty of the orphans' court to weigh the loss the children would suffer against the harm they might endure if Father's rights remained intact.  *See T.S.M.*, *supra* at 269.  When the court did so here, it found that termination would best serve the children's needs and welfare.  The record supports the court's finding, particularly in light of testimony that the children's behaviors and emotional health deteriorated around the time of their contact with Father and improved when that contact decreased.  *See* N.T., 5/27/20, at 83, 156-58, 236; N.T., 9/2/20, at 9-18, 74-86.  Thus, we affirm the court's decision to terminate Father's parental rights pursuant to § 2511(b).

Based on the foregoing, we conclude the orphans' court did not err or abuse its discretion in terminating Father's parental rights to D.D.1, D.D.2, and D.D.3 involuntarily, and we affirm the court's October 29, 2020 decree.

Decree affirmed.

---

[8] While D.D.1, D.D.2, and D.D.3 were not in a pre-adoptive home at the time of the termination hearing, CYS had identified a potential pre-adoptive home for them.  N.T., 9/2/20, at 24, 29-32; *see also In re K.C.F.*, 928 A.2d 1046, 1053-54 (Pa.Super. 2007), *appeal denied*, 936 A.2d 41 (Pa. 2007) ("[T]he termination statute does not require children to be placed in a pre-adoptive home as a precondition to termination of parental rights.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/11/2021