*Commonwealth v. Morris,* 493 Pa. at 174, 425 A.2d at 719–20 (citation omitted).

In sum, trying the murder cases jointly created a strong likelihood that the jury would infer that Appellant had a propensity to commit the crimes charged, and this would have influenced the jury in its determinations of guilt and in deliberating in the penalty phase. It is hard to imagine a more prejudicial effect on a defendant than being convicted for a murder on the basis of compelling evidence that the defendant committed a *different* murder. While I recognize that even with separate trials the result might not have been different for Appellant, I am convinced that it is our responsibility to ensure that every protection is provided for a fair trial, particularly in capital cases.

Justice BAER joins this dissenting opinion.

**In the Matter of K.C.F., L.T.F., and T.C.A., Minor Children.**

**Appeal of T.L.F. Mother.**

Superior Court of Pennsylvania.

Submitted April 16, 2007.
Filed June 12, 2007.

Elizabeth A. Hoffman, Harrisburg, for appellant.

Jason Kutulakis, Carlise, for Dauphin County Children and Youth, appellee.

Lawrence J. Rosen, Harrisburg, guardian ad litem.

BEFORE: HUDOCK, JOHNSON and KELLY, JJ.

OPINION BY KELLY, J.:

¶1 Appellant, T.L.F. (Mother), appeals from the order entered in the Dauphin County Court of Common Pleas, after remand from this Court, involuntarily terminating her parental rights. We affirm finding that: (1) the expert witness was qualified to testify about the bonds between Mother and her children; (2) termination of Mother's parental rights would best serve the children's needs; and (3) Mother's claims that the children were unlikely to be adopted are not persuasive.

¶2 Mother is the natural mother of T.C.A., age 11, L.T.F., 9, and K.C.F., 8.[1] In July of 2003, Mother voluntarily placed the children in the custody of the Dauphin County Children and Youth Agency (CYA), explaining that she felt overwhelmed and frustrated and that she was abusing drugs. These explanations raised concerns that Mother was not supervising the children; she was, in fact, subsequently convicted of endangering the welfare of children and sentenced to probation. The children were adjudicated dependent in August of 2003 and have since been in foster care. The family service plan required Mother to attend drug and alcohol counseling and parenting classes, obtain mental health treatment, obtain stable housing and employment, and visit with the children. Beginning in March of 2004, however, Mother was incarcerated for drug and alcohol use.

¶3 In February of 2005, CYA filed a petition for involuntary termination of Mother's parental rights to these three children. After a hearing, the court entered an order granting CYA's petition, from which Mother took an appeal. A panel of this Court[2] affirmed the trial court's finding that CYA had proven the statutory grounds relied upon in seeking termination.[3] However, the panel held that there was no testimony, expert or lay, presented as to the effect termination would have on the children. While a CYA supervisor testified that there did exist

---

1. These were the children's' ages at the time the trial court entered the instant order. Mother also has three other children who were placed with family members and are not subject to the order.

2. *In re K.C.F.*, 895 A.2d 655 (Pa.Super.2006) (unpublished memorandum).

3. Specifically, CYA sought termination under sub-sections (5) and (8) of the section 2511(a) of Adoption Act, which provide:

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the ser-

vices or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

> * * *

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(5), (8).

bonds between Mother and the children, he also stated that no evaluation had been made of the impact termination might have on those bonds. Accordingly, this Court remanded the matter to allow the parties to present testimony regarding the emotional bond between Mother and the children and the effect a termination of parental rights would have on the children.

¶ 4 Pursuant to our order, the trial court held a hearing on April 10, 2006. CYA presented one witness, clinical psychologist Dr. Kasey Shienvold. Mother objected to the qualification of Dr. Shienvold as an expert witness, but the trial court overruled her objection. Dr. Shienvold testified that he interviewed the children and their foster mother, as well as Mother, to "get a history of all three children, to understand their behaviors from [Mother's] perspective as well as from the children's perspective and the foster mother's perspective," and to learn how the children viewed Mother "in terms of the ability to meet their needs both physiologically and emotionally." (N.T. Hearing, 4/10/06, at 14).

¶ 5 On October 4th, the trial court entered an opinion and order terminating Mother's parental rights. She appealed, arguing that the trial court abused its discretion or erred in: (1) finding Dr. Shienvold was qualified to assess whether termination of her rights would be detrimental to the children; (2) finding CYA presented clear and convincing evidence to demonstrate termination would have a detrimental impact on the children; (3) basing its decision to terminate her rights on evidence related to her parenting skills and the children's behavioral problems; and (4) failing to consider that the children are not in a pre-adoptive home and that their ages make it less likely they will be adopted.

¶ 6 Preliminarily, we note:

In an appeal from an order terminating parental rights, our scope of review is broad and comprehensive, but our standard of review is narrow. We consider all the evidence, along with the legal conclusions and factual findings of the trial court. We reverse only if we find an abuse of discretion, an error of law, or insufficient evidentiary support.

*In re C.P.*, 901 A.2d 516, 520 (Pa.Super.2006) (internal citations omitted). Section 2511(b) of the Adoption Act provides,

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). Furthermore,

An inquiry into whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child is a distinct aspect of a termination hearing, to be undertaken only after the statutory requirements of section 2511(a) have been met. Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

*In re C.P., supra* (internal citations omitted).

¶ 7 Mother's first issue focuses on whether Dr. Shienvold was qualified to testify as an expert witness in the instant case. She states that while he "apparently had sufficient training and experience in [ ] assessments required for custody cases," "he did not have the specialized knowledge required for evaluations in termination cases." (Mother's Brief at 9). We disagree.

¶ 8 "The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court." *McClain v. Welker*, 761 A.2d 155, 156 (Pa.Super.2000) (quoting *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 839 (Pa.Super.1999)), *appeal denied*, 565 Pa. 647, 771 A.2d 1286 (2001). "[I]t is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one." *McClain, supra* at 156–57 (quoting *Miller v. Brass Rail Tavern*, 541 Pa. 474, 664 A.2d 525, 528 (1995)). "In general, to qualify as an expert witness, one must only 'possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience.'" *Freed v. Geisinger Med. Ctr.*, 910 A.2d 68, 73 (Pa.Super.2006) (quoting *Flanagan v. Labe*, 547 Pa. 254, 690 A.2d 183, 185 (1997)).

¶ 9 Instantly, Dr. Shienvold stated that he has a bachelor's degree in psychology and master's and doctoral degrees in clinical psychology, has been trained in bonding and assessment issues, and has attended continuing education classes on child custody evaluations and parent and child relational issues. He is engaged in private practice, primarily with "high conflict families" and "child custody evaluation work," and regularly assesses "the bond or attachment between parent and child as it relates to parenting competency." (N.T., at 6, 7–9). He has also previously testified as an expert witness in custody cases. Dr. Shienvold disclosed that although this was his first assessment performed for CYA, he has conducted more than twenty custody evaluations, providing conclusions and recommendations specifically based on a child's attachment to a parent. He also conceded that he had not previously performed an assessment of the parent-child bond in a case where a county agency has pursued termination of parental rights. However, he reasoned that often in his custody cases, one parent desires that the other parent be denied access to the child.

¶ 10 We note Mother's emphasis on Dr. Shienvold's lack of experience in assessing a parent-child bond in the context of a proceeding to terminate parental rights. Nevertheless, in light of the liberal standard for qualification as an expert witness, we agree with the trial court that Dr. Shienvold was qualified to testify as an expert here. *See McClain, supra.* Specifically, "based on his training, qualifications, and experience on a number of occasions," he could "evaluate whether a bond exists between [ ] Mother and these children and whether it would be detrimental to the children to terminate [ ] Mother's parental rights." (Trial Court Opinion, filed 10/4/06, at 2). Mother contends that Dr. Shienvold did not consult scholarly journals in preparation for the instant case; however, she ignores his references to several books on parenting evaluations and a child welfare handbook for psychological assessments of attachment and bonding.

¶ 11 Finally, we reject Mother's reasoning that Dr. Shienvold's "[inability] to render an opinion regarding whether termination would serve the best interests and welfare of the children" is an additional grounds for disqualifying him as an

expert. (*See* Mother's Brief at 9). Assessment of a proposed expert's qualifications occurs prior to his giving substantive testimony and focuses on his expertise; his initial qualification as an expert is not affected by the substance of his subsequent testimony. *See Freed, supra.* Accordingly, we find the court did not abuse its discretion in allowing Dr. Shienvold to testify as an expert witness. *See McClain, supra.*

■ ¶ 12 Next, we address Mother's second and third issues together. She argues that Dr. Shienvold's evaluation was incomplete and that the court improperly focused on only her deficient parenting skills. She concedes that although Dr. Shienvold testified about the children's feelings for her, he "provided no evidence to show clearly and convincingly that the children would not 'suffer extreme emotional consequences' if the relationship was severed." (Mother's Brief at 14). Mother also claims that Dr. Shienvold's testimony "was ambiguous at best," because he found the children had a "strong bond" but "insecure attachment" to her. (*Id.* at 15). Mother avers that Dr. Shienvold's conclusion about this insecure attachment was improperly drawn from reports of her poor parenting. Accordingly, Mother asserts, CYA failed to show that termination was in the children's best interests. We disagree.

¶ 13 Dr. Shienvold testified that T.C.A., age 11, could recall positive experiences with Mother, but "continually referred" to episodes in which Mother was angry at the children, was inconsistent in her treatment of them, or had physical altercations with her boyfriend in front of them. (N.T., at 16). T.C.A. informed Dr. Shienvold that "while he certainly loves his mother and would like to see her, he does not feel that he could live with his mother anymore because, as he put it, he just does not trust her to care for him the way that he needs."

(*Id.*). Dr. Shienvold relayed the foster mother's report that although T.C.A. originally displayed "pretty significant" aggressive and oppositional behavior, this behavior had improved over five or six months. (*Id.*). Dr. Shienvold also learned that in the previous year, T.C.A. had been placed ten different times.

¶ 14 Dr. Shienvold then testified that L.T.F., the second child, age nine, "spoke most fondly about [Mother] and expressed the greatest desire to move back in with [her.]" (*Id.* at 17). L.T.F. also noted that Mother had physical altercations with her boyfriend in front of the children, and often struck them when she was upset or intoxicated. (*Id.*). L.T.F. indicated he was "often [ ] very scared" of Mother when she was upset or angry. (*Id.*). Dr. Shienvold stated that both Mother and the foster mother described L.T.F. as the most behaviorally erratic in that he became angry very easily. L.T.F. agreed that he "often [became] irrational and act[ed] out when he [was] very upset." (*Id.* at 18). According to Dr. Shienvold, L.T.F. also reported that Mother "was not very good at soothing him or calming him down when he got very upset, but then he admitted that ... there's not really anybody who could soothe him or calm him when he would get very agitated." (*Id.*). Dr. Shienvold testified that L.T.F.'s statements indicate that Mother "was inconsistent in her ability to make [the children] feel safe and secure while in her care." (*Id.* at 20–21).

¶ 15 Regarding K.C.F., age 8, whom Mother and the foster mother described as the best behaved and "easiest to get along with," (*id.* at 21), Dr. Shienvold testified that K.C.F. did well in school academically and behaviorally. Like the other children, K.C.F. stated that Mother often fought with her boyfriend in front of the children. She also stated that these altercations oc-

casionally required police intervention, and that Mother's boyfriend sometimes struck the children. K.C.F. "reported that she misses [Mother] but [ ] denied having good memories of [her.]" (*Id.*). K.C.F. also stated that she was a "good mother when she was not mad or drunk." (*Id.*). Dr. Shienvold added that K.C.F. expressed a desire to live with Mother, "even though [she knows] that she's not consistent or capable of caring for her on a regular basis," and that for now, she felt her foster parents are better parents. (*Id.* at 22). Dr. Shienvold also stated that K.C.F. "demonstrated the most disinhibited style of attachment," meaning she "indiscriminately will attach to people," such as asking Dr. Shienvold within ten minutes of their interview whether she could live with him. (*Id.*).

¶ 16 Finally, Dr. Shienvold testified that the children's attachments to Mother were "insecure" bonds. (*Id.* at 25). He explained that in a "secure" bond, the child feels safe and secure and anticipates that his physiological and psychological needs will be met by the caretaker. (*Id.*). Dr. Shienvold further opined that although T.C.A. and K.C.F. had "ambivalent attachment[s]" to Mother, so that they fully admit they miss and love her, they also understand she is not consistently able to meet their needs. As a result, Dr. Shienvold stated, their trust as to whether Mother would be able to care for them properly is compromised, and they are not as likely to feel safe and secure with her. Dr. Shienvold stated that L.T.F. had more of a "disorganized type" of attachment, and behaved erraticly and unpredictably toward both his caretakers and peers. Dr. Shienvold explained that L.T.F. often over-expresses his emotions in order to have his needs met; his behavior suggests that he does not feel that "a normal range of emotion would trigger in the caretaker what needs to be done."

¶ 17 Dr. Shienvold also conceded that he did not observe the children interacting with Mother, explaining his belief that, given the possibility of termination and the fact that Mother had not seen the children in almost two years, it would be detrimental to the children to have a brief reunion with her and then no further contact. He also thought such an observation was not as pertinent to children over age six or seven because they have sufficient verbal capacity for interviews. Specifically, here the children were old enough and able to verbalize their own issues and answer his questions. On cross-examination, Dr. Shienvold conceded that Mother's lack of contact with the children for two years could itself be a source of the children's hostility towards her.

¶ 18 In light of the information given by Dr. Shienvold, we reject Mother's claims that his testimony as to the bond between her and the children was ambiguous. Dr. Shienvold generally defined the types of bonds that may exist between a child and parent, and specifically testified that the children had a bond with Mother. Although Dr. Shienvold did not explicitly define an "ambivalent" bond, he explained that the children had insecure bonds with Mother in that they felt she was not consistent in meeting their needs, leaving them feeling unsafe and not secure. Although Dr. Shienvold explained what the children felt about their past with Mother and her parenting skills, T.C.A. and K.C.F. specifically stated that they did not trust Mother would be able to properly care for them in the future. We find the trial court's determination that Dr. Shienvold's testimony demonstrated termination would serve the children's developmental, physical, and emotional needs, was not an abuse of discretion. *See In re C.P., supra.*

¶ 19 We now address Mother's final claim that the trial court failed to consider

the fact that the children are not in pre-adoptive homes. She alleges that the court's decision to terminate her rights "will probably subject" the children to "yet another change in foster parents," and the children's ages "make it less likely that they will be adopted," or less likely that they will be adopted into the same family. (Mother's Brief at 18). Mother likens the instant case to that of *In re E.M.*, 908 A.2d 297 (Pa.Super.2006). We disagree.

¶ 20 In *In re E.M.*, the two children were twelve and eleven years old when they were adjudicated dependent and placed in the same foster home. *Id.* at 299. By the time of the hearing on the petition to terminate the mother's parental rights, the children were fifteen and fourteen, and remained staunchly loyal to the mother despite having had only sporadic and brief telephone and email contact with her for over two and half years. *Id.* at 302. On appeal, this Court conducted an in-depth review of whether termination was in the best interests of the children. *See id.* at 306–09. Mother asserted that if her rights were terminated, either the children would remain in foster care or the agency would seek adoptive placement, to which the children must consent. *Id.* at 306. However, this Court reasoned that because both children had indicated they would not consent to adoption,[4] no relative had been identified for placement, their current placement was not a pre-adoptive home, and because the children were older, they would "most likely remain in foster care until they reach majority." *Id.* The mother thus averred that termination would not affect the children's current physical arrangement, but would only serve to "make [them] true orphans." *Id.* at 307. She suggested instead that the children "currently [had] permanency to the fullest extent," and that the best solution was to deny the termination petition but allow the current foster mother to assume permanent legal custodianship. *Id.* at 307. This Court emphasized the older age of the children, in both the contexts of the unlikelihood that they would be adopted, and their possible reunification with the mother "in the not too distant future" when they reached eighteen. *Id.* at 308. Accordingly, we held that although termination would not harm the children, "given the unique circumstance of [*In re E.M.*] the trial court erred in finding termination would serve the needs and welfare of the children." *Id.* at 308.

¶ 21 In the instant case, Mother concedes that the children in *In re E.M.* were older than her children. Nevertheless, she maintains that their ages likewise "considerably reduce their chances of adoption." (Mother's Brief at 18). We disagree; fifteen and sixteen are significantly closer to the age of majority than eleven, nine, and eight. Even more importantly, however, the children's ages in *In re E.M.* were only two out of a host of critical factors affecting the Court's decision. In that case, the children's first preference was to reunite with their mother. Here, both K.C.F. and T.C.A. stated they did not believe Mother could properly meet their needs, and although L.T.F. did state he wished to be reunited with Mother, it was shown he felt insecure with her. In addition, in *In re E.M.*, a detailed explanation of the interconnected reasons why the children would probably remain in foster care was presented; here, Mother offers only a bald allegation that her children's ages would prevent them from being adopted. Finally, we note that the

---

4. One of the children had also appealed from the order terminating the mother's parental rights. *Id.* at 299, 306.

termination statute does not require children to be placed in a pre-adoptive home as a precondition to termination of parental rights. *See* 23 Pa.C.S.A. § 2511.

¶ 22 Accordingly, we affirm the order of the trial court terminating Mother's parental rights to T.C.A., L.T.F., and K.C.F.

¶ 23 Order affirmed.