J-A10033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GIAM TRUONG | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ANNA TEPPIG | : | |
| | : | |
| Appellant | : | No. 1 MDA 2022 |

Appeal from the Order Entered November 29, 2021
In the Court of Common Pleas of Cumberland County
Civil Division at No(s): 2018-08485

BEFORE: PANELLA, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.: **FILED JULY 29, 2022**

Appellant, Anna Teppig ("Mother"), appeals from the order entered in the Cumberland County Court of Common Pleas, granting Giam Truong ("Father") overnight visitation with their minor children, F.T., G.T., and L.T. ("Children"). We affirm.

The trial court set forth the relevant facts and procedural history of this case as follows:

> The parties to this challenging custody litigation were married at the time that [Children] were born. The breakup of the marriage stemmed from Father's criminal charges and eventual incarceration after he pled guilty to statutory rape in which the victim was twelve (12) years old at the time Father initiated sexual contact. The parties had lived together in Georgia and Mother filed for divorce in Georgia during Father's incarceration. She eventually moved with [Children] to Pennsylvania. Although the divorce decree provided Mother sole legal and physical custody of the children, Mother permitted contact between [Children] and Father by way of telephone as well as some visits with him

while he was incarcerated and for a period of time after release. This contact occurred from approximately late 2013 to 2017.

In August of 2018, following a modification to Father's probation conditions that permitted him to have supervised contact with [Children], Father filed a custody Complaint seeking visitation with [Children]. He continued to reside in Georgia and therefore, has only sought limited partial custody during the school year and has only recently identified the request for expanded visitation to take place in Georgia during the summer months. Following conciliation, the parties were directed to identify a reunification counselor and Katie J. Maxwell, Esquire [("GAL")] was appointed as guardian *ad litem* for the children. A series of orders were entered by [the trial court] from December 2018-October 2019. These orders were issued immediately following status conferences with counsel for the parties, the GAL and the reunification counselor. The orders slowly permitted and expanded Father's contact with the children subject to the review and approval of the GAL and reunification counselor including discussion with counsel and their general agreement…. Throughout 2020 (despite the complications brought on by the COVID-19 pandemic) and from January 2021-May 2021, Father's visitation continued to be extended in length and/or frequency. An order dated May 7, 2021 contemplated overnight visitation to begin subject to the input of the reunification counselor. At the same time that the overnight visitation was being contemplated, Mother's counsel identified for the first time, an open federal investigation regarding Father and alleged child pornography. Despite numerous attempts of the GAL and Father's counsel to glean a better understanding of the nature and status of the investigation, the details remained allusive and vague. The only clarification offered was that the material resulting in the investigation was specifically related to the same criminal conduct of Father involving the 12 year old victim.

As the parties were unable to reach an agreement to overnight visitation and upon Mother's demand for a custody trial, hearings were held on September 27, 2021 and November 5, 2021….

[At the September 27, 2021 hearing,] the GAL testified and recommended permitting Father's visitation to increase to include overnight visitation. A now adult adoptive child of the parties, Joe Pham, testified that he met Mother and Father at church when he was approximately fourteen (14) years old. Joe was fostered, and eventually adopted by Mother and Father who were married at the time he met them. During the time that Joe lived with Mother and Father, all three subject minor children had been born and also lived in the marital home. Joe explained that he had a very pleasant life while living with Mother and Father, and Father was not an intimidating figure. He denied that Father ever encouraged him to have multiple sexual partners as a teenager. Joe described [Children] as being very happy while he lived there. He acknowledged an incident when he was fifteen (15) years old where Father struck him while they were in the home. The incident related to Joe telling Mother information that Father asked he withhold after Father fed him fast food for dinner. Joe described this as a one-time thing, and Father apologized after it had happened. Joe and Father did get into an argument when Joe was moving out and during the argument Father broke Joe's phone. There were no other physical incidents involving Joe or that he witnessed.

Joe decided to move out once he became aware of Father's sexual relationship with a minor and that despite Mother's awareness of the relationship, she continued to frequently have the minor to the home to babysit [Children]. As he was no longer a minor, he decided he was ready to move out on his own.

The reunification counselor, Jamie Orris, [testified that she] has been providing reunification counseling to the family since January 2019. She generally sees the children following their visits with Father. She described Father as being highly cooperative. She supports visitation including overnight visits at this time, however, she identified that she still has some reservations. Even though the visits are great, the kids are happy and they want to have overnights with their Father, she is well aware that sexual offenders have a high recidivism rate. Her unease has to do with Father's past and not what is presently happening during the visitation process. Despite her reservations, she

- 3 -

believes overnight visitation should be initiated at this time.

Father [testified that he] resides in Georgia with his current wife, Amanda Truong and their two-year-old child, A.T. All three minor subject children have a positive relationship with their half sibling, A.T. There are multiple paternal relatives (aunts/uncles, grandparents) who reside near Father in Georgia and maintain a close connection with him. Father owns and works in a restaurant located in Georgia. He was convicted of statutory rape as a result of a sexual relationship he commenced with a twelve (12) year old. The relationship continued for several years thereafter until Father was arrested and incarcerated. He was convicted in 2013 and he remained in prison until 2015. He was released to a transitional center where he remained until 2016. Father's parole ended in 2018 and the terms of his parole were modified in April of 2018 to allow Father supervised contact with his own children and to have pictures and videos of his own children. At some point well before Father's arrest, Mother became aware that Father was having a sexual relationship with a minor. Father and Mother had an open marriage and engaged in group sex with other couples. They had shared sexual encounters with Father's minor victim when the minor was under the age of eighteen (18), but over sixteen (16), the legal age of consent in Georgia. Father discussed the sexual offender treatment he received after he was released from the transitional center as part of his parole requirements and his realizations about himself as a result of that treatment.

While Father was incarcerated, Mother permitted [Children] to visit Father and speak with him multiple times a week on the phone. The phone calls continued until 2017, even after Mother moved out of Georgia with the children. [Father believes Mother stopped permitting him to contact Children] around the same time Mother settled down with her current husband. Father obtained permission from his probation officer to come to Pennsylvania in 2018, close in time to L.T.'s birthday. He sent Mother a text message that he was going to drop off gifts for [Children], and Mother never responded. While he and his wife were driving in Mother's neighborhood, Father saw F.T. walking and they eventually recognized each other. Father stopped, and he and F.T. had a happy, but brief reunion. He provided her the gifts, but

Mother called the police as a result of this contact and filed for a PFA. Father ultimately agreed to a PFA being entered against him in October 2018 that expired in February 2020 without any violations. Mother stopped all communications with Father at some point in 2018, and, from that point forward, communications occurred only through counsel.

As a result of the instant custody action Father filed, [the trial court] held a pretrial conference in January 2019 and permitted [Children] to initiate contact with Father, but Father could not make the initial contact. Following a July 2019 status conference, [the court] permitted four hour visits with Father's wife, Amanda, supervising. In September 2019, a Section 5329 Risk of Harm Evaluation was ordered. Georgia does not have that exact type of statutory evaluation, thus Father obtained a sexual offender evaluation with Matthew B. Connolly, which was ultimately deemed acceptable by the [c]ourt.

Concerns identified by Mother regarding visitation during the ongoing status conferences included Father taking [Children] across state lines, Father holding a portion of a visit in his hotel lobby and F.T. buying a bra during a visit with Father. These concerns were discussed during status conferences and it was learned Father took the children to Maryland during a visit in 2020 to watch a movie because no local movie theatres were open and operating. One visit partially took place in a hotel lobby where Father was staying. This occurred because L.T. needed to use a restroom and the COVID-19 pandemic limited what restroom options were available. They never left the lobby area of the hotel. Finally, F.T. purchased her own bra during a visit that took place at the mall and at no time did Father enter the particular store where the bra was purchased. All of these concerns were discussed at status conferences and addressed with Father as part of the reunification counseling and at no time did either the GAL or Ms. Orris recommend visits decrease as a result of the aforementioned concerns.

\* \* \*

[At the November 5, 2021 hearing,] Matthew B. Connolly, a licensed professional counselor, who specializes in treating sex offenders, treated and evaluated Father. In the Fall of

2018, Mr. Connolly performed a Psychosexual Offender Evaluation of Father. Based on the treatment and evaluation, Mr. Connolly had no reason to believe that Father would have a sexual interest in his own children. Father underwent polygraph testing on a regular basis for probation and treatment purposes that encompassed questions addressing interest in sexual contact with family members, including his children. When asked such questions, there was no significant response when Father denied contact. Mr. Connolly found Father to be at low risk to recidivate generally and a low risk to his children. He was in agreement with supervised contact between Father and [Children].

Mother presented testimony from Ashley Milspaw, PsyD, who did not evaluate Father, but reviewed records and spoke with Mother's attorney resulting in her generating a report dated September 20, 2021. Dr. Milspaw recommended Father undergo a Section 5329 Risk of Harm Evaluation. She expressed concerns about Father having overnight visitation before there was a Section 5329 Risk of Harm Assessment completed, before the children were evaluated by a clinical psychologist, and before the supervisor had been properly trained or executed a supervisory affidavit.

(Trial Court Custody Opinion, filed 11/29/2021, at 1-8).

Mother testified that Father was physically violent during their marriage and would intimidate her by yelling, punching the wall, and throwing objects. Mother also stated that Father raped her during their marriage and forced her to engage in sexual encounters where she was uncomfortable. Mother testified that she did not want an open relationship, but Father coerced her to agree. Father set up online dating profiles for her, asked her to describe her sexual encounters with other men, and forced her to engage in similar acts with Father.

Mother expressed concerns that Father was grooming Children by attempting to gain their trust and lower their defenses. Specifically, Mother noted conversations between Father and F.T. where Father expressed that he loved and missed her, inquired about her breakup with her boyfriend, and attempted to comfort her. Further, Mother raised concerns about inappropriate conduct while Children are in Father's care such as F.T.'s purchase of a bra and L.T.'s flirtatious behavior, such as winking and blowing kisses, which he stated that he learned from Father.

Jeremy Teppig, Mother's current husband, testified that he found an SD card in their house which belonged to Father. Mr. Teppig never saw what was on the SD card but was concerned that there was inappropriate content on it, so he turned it over to the local police department because he is a mandated reporter. The local police department did not find criminal content after investigation. Mr. Teppig found additional electronics that belonged to Father and turned it over to the Henry County Police Department in Georgia. The Henry County Police Department informed Mr. Teppig that they found child pornography on the electronics, specifically images of Father and H.N., the minor who he statutorily raped. Mr. Teppig stated that the Henry County Police Department turned over the evidence to a federal agency, but Mr. Teppig was unsure about the status of any federal investigation into the matter.

Regarding the photos on the electronics, Father testified that those

electronics have not been in his possession since before his incarceration.

After considering all the evidence, the court entered an order on November 24, 2021[1] granting overnight visitation to Father subject to the following conditions: 1) the visitation supervisor, Amanda Truong, must complete supervision training by a sexual offender treatment provider and sign an affidavit of accountability; 2) the reunification counselor must meet with Children no more than three business days following each visitation with Father; and 3) Father and Ms. Truong must receive medical training to care for L.T.'s specialized needs. On December 29, 2021, Mother filed a timely notice of appeal and a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother raises the following issues for our review:

> Did the trial court err as a matter of law when it granted overnight visitation to Father, who has a criminal history of child abuse, without ordering a Section 5329 evaluation, considering the facts underlying Father's 2013 guilty plea to statutory rape, and determining that Father no longer poses a threat of harm to the children, as required by 23 Pa.C.S. § 5328(a) and § 5329(a)?
>
> Did the trial court abuse its discretion when it granted Father's motion *in limine* to preclude the testimony of H.N., a willing witness, where Father's 2013 guilty plea to statutory rape was predicated on his rape and sexual abuse of H.N. when she was only twelve years old?
>
> Did the trial court abuse its discretion when it granted overnight visitation to Father, where the trial court's factual

_____

[1] Although the court's order was filed of record on November 24, 2021, Pa.R.C.P. 236 notice was not sent until November 29, 2021.

findings and other evidence in the record did not support the court's legal conclusion that overnight visitation was in the best interest of the children?

Did the trial court abuse its discretion in giving substantial weight to the conclusions of Father's expert, Matthew Connolly, where Connolly did not conduct a Section 5329 evaluation, did not render an opinion on whether overnight visitation would pose a threat of harm to the children, did not have current information about Father, and Connolly's conclusion that Father had a low risk of recidivism was contradicted by Father's test results, which revealed that he had a higher-than-average likelihood of recidivism?

(Mother's Brief at 4-5) (reordered for purposes of disposition).

In her first issue on appeal, Mother asserts that Section 5329(a) of the Custody Act required the court to conduct an evaluation to determine that Father does not pose a threat of harm to Children before making any order of custody because of Father's prior statutory sexual assault conviction.[2]  Mother

_____

[2] Section 5329 of the Custody Act states in relevant part:

**§ 5329. Consideration of criminal conviction**

**(a) Offenses.**--Where a party seeks any form of custody, the court shall consider whether that party or member of that party's household has been convicted of or has pleaded guilty or no contest to any of the offenses in this section or an offense in another jurisdiction substantially equivalent to any of the offenses in this section.  The court shall consider such conduct and determine that the party does not pose a threat of harm to the child before making any order of custody to that party when considering the following offenses:

*…..*…..*

*(Footnote Continued Next Page)*

contends that the court failed to properly conduct an initial evaluation to determine whether Father posed a risk to Children and further failed to appoint a qualified professional to evaluate and counsel Father. Mother argues that the psychosexual evaluation prepared by Matthew Connolly ("Connolly Report") was an inadequate substitute for a Section 5329 evaluation because

---

18 Pa.C.S. § 3122.1 (relating to statutory sexual assault).

\* \* \*

**(c) Initial evaluation**.--At the initial in-person contact with the court, the judge, conference officer or other appointed individual shall perform an initial evaluation to determine whether the party or household member who committed an offense under subsection (a) poses a threat to the child and whether counseling is necessary. The initial evaluation shall not be conducted by a mental health professional. After the initial evaluation, the court may order further evaluation or counseling by a mental health professional if the court determines it is necessary.

**(d) Counseling**.—

(1) Where the court determines under subsection (c) that counseling is necessary, it shall appoint a qualified professional specializing in treatment relating to the particular offense to provide counseling to the offending individual.

(2) Counseling may include a program of treatment or individual therapy designed to rehabilitate the offending individual which addresses, but is not limited to, issues regarding physical and sexual abuse, the psychology of the offender and the effects of the offense on the victim.

23 Pa.C.S.A. § 5329(a), (c), (d).

it did not assess whether Father poses a threat of harm to his children.  Mother concludes that the court erred by relying on the Connolly Report as an adequate Section 5329 risk assessment and this Court should vacate the custody order and remand for a proper evaluation.  We disagree.

Preliminarily, we observe that Mother failed to object when the court accepted the Connolly Report as an adequate Section 5329 assessment.  The record shows that on August 29, 2019, Mother filed a petition seeking an order that Father undergo a sex-offender specific evaluation.  In response, the court ordered Father to submit to a Section 5329 risk of harm evaluation.   On October 11, 2019, Father submitted the Connolly Report to the court at a status conference, and the court accepted the Connolly Report as complying with the requirements of Section 5329.  Significantly, Mother did not object to the court's acceptance of the Connolly Report as a Section 5329 assessment, file a motion to reconsider that ruling, or request a hearing on this matter.  Additionally, Mother failed to object when Father presented Mr. Connolly as an expert witness or moved the Connolly Report into evidence at the custody hearing.   On this record, Mother has not preserved her claim of error concerning the court's acceptance of the Connolly Report as a Section 5329 assessment.  **See Coulter v. Ramsden**, 94 A.3d 1080, 1089 (Pa.Super. 2014), *appeal denied*, 631 Pa. 719, 110 A.3d 998 (2014) (stating: "[O]nly claims properly presented in the [trial] court are preserved for appeal"); Pa.R.A.P. 302(a) (stating: "Issues not raised in the [trial] court are waived

and cannot be raised for the first time on appeal").

Further, Mr. Connolly testified that he is a licensed counselor who has been working with sex offenders since 1999. He is an approved sex offender treatment provider for the Georgia Department of Corrections and Pardons and Parole, member of the Georgia Association for the Treatment of Sexual Abusers and member of the Georgia Sex Offender Registry Review Board. Mr. Connolly testified that his evaluation of Father consisted of a multitude of industry accepted, objective tests designed to examine Father's sexual proclivities and risk of recidivism, which included an assessment of what, if any, sexual interest he had in his own biological children. Based on Mr. Connolly's credentials, experience and the scope of his evaluation and report, the court concluded that the Connolly Report adequately assessed the risk of harm to Children as required by Section 5329.[3] Thus, even if Mother had

---

[3] Mother's reliance on **Ramer v. Ramer**, 914 A.2d 894 (Pa.Super. 2006) to support her assertion that the Connolly Report is inadequate under Section 5329, is misguided. **Ramer** reaches its disposition based on the statutory language of 23 Pa.C.S.A. § 5303 which was repealed in 2010. Mother asserts that Section 5303 is the precursor to Section 5329 and as such, **Ramer**'s disposition applies to the instant matter. However, **Ramer** specifically interprets the application of language in Section 5303 that states that a court **shall** appoint a qualified professional to provide counseling to an offending parent. In comparison, Section 5329 states that a qualified professional is not required to make an initial evaluation and the court **may** order additional evaluation and counseling by a qualified professional. Additionally, **Ramer**'s holding that the evaluating psychologist was not a qualified professional under the statute was because the psychologist had no specific or specialized training in evaluating sex offenders. Here, Mr. Connolly specializes in providing treatment to sex offenders and evaluating their risk of recidivism. Accordingly, **Ramer** is not dispositive in the instant matter.

- 12 -

properly preserved the issue for appellate review, we discern no error in the court's determination.

In her second issue, Mother argues the court erred when it granted Father's motion *in limine* to preclude the testimony of H.N., the victim of Father's statutory rape conviction. Mother asserts that H.N.'s testimony "would have addressed the circumstances surrounding Father's 2013 guilty plea—evidence that goes directly to the issue of whether Father remains a threat of harm to the children." (Mother's Brief at 60). Further, Mother asserts that even though H.N. would have testified about events that occurred nine years ago, her testimony is relevant and probative because it would have "educated the court about how sexual predators—and Father in particular—operate, and how they manipulate children to get what they want." (***Id.*** at 61). Mother concludes the court abused its discretion by precluding H.N.'s testimony and this Court should grant appropriate relief. We disagree.

"The admission or exclusion of evidence … is within the sound discretion of the trial court." ***In re K.C.F.***, 928 A.2d 1046, 1050 (Pa.Super. 2007*)*, *appeal denied*, 594 Pa. 705, 936 A.2d 41 (2007) (quoting ***McClain v. Welker***, 761 A.2d 155, 156 (Pa.Super. 2000)). "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." ***A.J.B. v. M.P.B.***, 945 A.2d 744, 749

(Pa.Super. 2008) (quoting **Bulgarelli v. Bulgarelli**, 934 A.2d 107, 111 (Pa.Super. 2007)).

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. Pa.R.E. 401. Pennsylvania Rule of Evidence 403 limits the admission of relevant evidence as follows:

> **Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons**
>
> The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.
>
> > *Comment*: Pa.R.E. 403 differs from F.R.E. 403. The Federal Rule provides that relevant evidence may be excluded if its probative value is "substantially outweighed." Pa.R.E. 403 eliminates the word "substantially" to conform the text of the rule more closely to Pennsylvania law. **See Commonwealth v. Boyle**, 498 Pa. 486, 447 A.2d 250 (1982).
> >
> > "Unfair prejudice" means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.

Pa.R.E. 403.

Instantly, Mother listed H.N. as a witness for the first time in an amended pretrial statement which was filed after the close of testimony on the first day of trial on September 27, 2021, but prior to the conclusion of the custody trial on November 5, 2021. On November 1, 2021, Father filed a motion seeking to preclude H.N.'s testimony, alleging unfair surprise and

asserting that the probative value would be outweighed by unfair prejudice because the testimony was needlessly cumulative. The court issued a rule to show cause concerning how H.N.'s testimony would be relevant and probative to the custody factors and would not result in cumulative evidence. Mother responded asserting that H.N. would provide more details and context of Father's abuse to refute Father's account. Additionally, H.N. would also provide testimony about instances she witnessed that give insight into Father's relationship with Mother and Joe Pham.

The court granted Father's motion to preclude H.N.'s testimony. In doing so, the court reasoned:

> …Father's criminal record and statutory rape of H.N. was a fact of record. The nuances of that sexual abuse were not probative of whether he would abuse his own children and were not relevant to the sixteen best interest factors. Mother was reminded, in the November 4, 2021 order precluding H.N.'s testimony, that she could impeach Father's credibility through her own testimony or other witnesses recalled in her case in chief. Mother failed to demonstrate how H.N.'s testimony about the known sexual abuse she endured as a child approximately ten years prior at the hands of Father would be probative of the best interest factors and not outweighed by prejudice.

(Trial Court 1925(a) Opinion, filed 2/1/2022, at 11-12).

The record supports the court's analysis. We note that Father testified that he statutorily raped H.N. and admitted that he groomed and manipulated her for this purpose. Mother testified about her relationship with Father during their marriage and provided additional details surrounding Father's involvement with H.N. to refute Father's and Joe Pham's testimony. Mother

- 15 -

also testified extensively about Father's tendency to manipulate others and provided a detailed explanation of the instances of manipulation and grooming that she believed was occurring between Father and Children. Based on the evidence that was before the court, we see no abuse of discretion in the court's decision that H.N.'s testimony would have been cumulative and unfairly prejudicial. ***See In re. K.C.F., supra***.

In her third and fourth issues combined, Mother argues that the trial court concluded that Father's criminal record weighed against granting him overnight visitation but failed to give this factor weighted consideration as required by 23 Pa.C.S.A. § 5328(a). Mother contends the court failed to properly consider the underlying facts of Father's prior conviction to determine whether he posed a risk to Children. Specifically, Mother asserts that Father has a history of sexually deviant behavior and the court ignored Mother's credible concerns that Father is grooming Children. Mother further complains the court erred by giving substantial weight to the Connolly Report because it is based on subjective tests conducted three years prior to the hearing and does not adequately assess whether Father poses a current risk to Children or whether overnight visitation is in Children's best interest. Mother concludes the court's conclusion that overnight visitation was in the best interests of Children was against the weight of the evidence and we must vacate the custody order. We disagree.

In reviewing a child custody order:

[O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.J.S. v. M.J.S.*, 76 A.3d 541, 547-48 (Pa.Super. 2013) (internal citation

omitted). Importantly:

With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

*M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa.Super. 2013), *appeal denied*, 620 Pa.

710, 68 A.3d 909 (2013) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650

(Pa.Super. 2011)).

The Child Custody Act provides:

### § 5328. Factors to consider when awarding custody

**(a)** **Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing

contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M., supra* at 336. A court's explanation of reasons for its decision, which adequately addresses the relevant custody factors, complies with [the statute]. *Id.*

Instantly, the trial court analyzed each of the 16 custody factors in its custody opinion. Specifically, the court found that the second factor weighed against Father because of the gravity of his prior conviction. Nevertheless, the court determined that the remaining factors weighed in favor of granting overnight visitation. The court noted that Father has been extremely

cooperative in the reunification process and has made therapeutic progress. Father has been accommodating to Children's schedules and granting overnight visitation would not result in disruption to the stability of Children's lives. Children have been happy with their visits with Father and are ready to have overnight visitation with Father. Overnight visitation with Father would foster Children's relationship with their extended family on Father's side, including their half-sibling who resides with Father full-time. Father is willing and able to provide for the needs of Children while they are in his care. The court noted that Father was not initially trained to care for L.T.'s specific medical needs but has since received medical training for this purpose.

Significantly, the court determined that there is no known current risk of harm to Children based on Father's conduct in the last three years. The court did not find Mother's claims of grooming to be credible because the instances noted by Mother only reflect Father's attempt to have a parental relationship with Children. Additionally, the court considered the reasoned recommendation of the GAL and the reunification counselor, who each stated that supervised overnight visitation was in the best interests of Children. The court also credited the testimony of Mr. Connolly, who recommended supervised overnight visitation. Although Mr. Connolly's assessment was conducted in 2018, Mother does not indicate any infractions by Father since then that would render Mr. Connolly's assessment inaccurate. Mr. Connolly's assessment is also bolstered by the recommendations of the GAL and

reunification counsel who have worked closely with Father and Children since 2018. Further, Mother's complaints regarding the Connolly Report concern the weight and credibility of the evidence, which are within the purview of the trial court. *See S.J.S., supra.*

On appeal, Mother essentially asks this Court to reweigh the Section 5328(a) factors in her favor. We have carefully reviewed the record in this case, and because the record supports the trial court's reasonable findings and those findings were not the result of an error of law or abuse of discretion, we accept the trial court's analysis and decline to reweigh the evidence. *See M.J.M., supra*. *See also R.L. v. M.A.*, 209 A.3d 391, 395 (Pa.Super. 2019) (reiterating our deferential abuse of discretion standard of review in custody cases and explaining that we will find abuse of discretion only where trial court's judgment was manifestly unreasonable or product of partiality, prejudice, bias or ill-will). Accordingly, we affirm the custody order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/29/2022