J-S10001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.L.G, MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1783 MDA 2025 |

Appeal from the Order Entered December 4, 2025
In the Court of Common Pleas of Franklin County Juvenile Division at
No(s): CP-28-DP-0000033-2021

BEFORE: DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY DUBOW, J.: **FILED: JUNE 12, 2026**

S.L.G. ("Mother") appeals from the December 4, 2025 order that changed the permanency goal of her 15-year-old daughter, A.W. ("Child"), from reunification to adoption. Upon review, we affirm.

In its Rule 1925(a) opinion, the trial court has authored a thorough, comprehensive, and accurate procedural and factual history which we adopt for purposes of this appeal. *See* Trial Ct. Op., 1/13/26, at 1-17. In sum, the Franklin County Children and Youth Services ("the Agency") has been involved with the family since 2021 due to concerns with Mother's inappropriate discipline and substance abuse as well as Child's behavioral and mental health.[1] On December 6, 2021, the trial court adjudicated Child dependent

---

[1] Child's father is uninvolved. The record reflects that Father was incarcerated in Texas when Child first came into the custody of the Agency, but that Father's current whereabouts are unknown.

and granted custody of Child to the Agency. The Agency proceeded to place Child intermittently in residential care and foster care depending on Child's mental health status. During this time, Child received extensive mental and behavioral health services while Mother made progress towards completing her goals of participating in parenting services, complying with recommended mental health services, participating in family counseling, and consistently visiting with Child. In March 2024, the trial court reunified Child with Mother and the Agency made referrals for in-home services including multisystemic therapy ("MST") and a hands-on parenting service ("SKILLS").

On August 15, 2024, the Agency obtained emergency custody of Child due to Mother's refusal to participate in both MST and SKILLS and Child's deteriorating mental health, including aggressive and violent behavior. The Agency initially placed Child in shelter care with Children's Aid Society. In November 19, 2024, Eric K. Bonsall, MD, conducted a Comprehensive Child Psychiatric Evaluation and diagnosed Child with: intermittent explosive disorder, oppositional defiant disorder, attention deficit hyperactivity disorder–combined type, sexual abuse, psychological abuse, marijuana use, and borderline personality traits.

In March 2025, the Agency placed Child in the Hoffman Homes residential treatment program where she remains. The trial court ordered Mother to comply with parenting services and mental health recommendations. The court further ordered Mother to obtain and maintain

stable housing and financial stability, participate in Child's mental health treatment, and consistently visit with Child.

On February 24, 2025, at the permanency review hearing the court found that Mother had been minimally compliant with the permanency plan.

On June 9, 2025, at the permanency review hearing the court found that Mother had been noncompliant with the permanency plan. Mother failed to appear at the hearing and the court appointed Child's guardian *ad litem* ("GAL") to be Child's educational decision maker. At the Agency's request, the court scheduled the next permanency review hearing to be a goal change hearing. On July 25, 2025, the trial court appointed legal counsel for Child.

On October 3, 2025, the trial court held a permanency review and goal change hearing. The trial court met with Child *in camera* with counsel for all parties, as well as Child's GAL, present. Child expressed a desire to reunify with Mother but acknowledged that both Mother and she had more work to do. At the request of the Agency, and based on Child's position, the trial court continued the goal change proceeding for sixty days to have additional time to assess Mother and Child's progress. Mother's court-ordered goals remained the same.

On December 2, 2025, the court held a permanency review and goal change hearing. The court heard *in camera* testimony from Child, who expressed a desire to be adopted. Child testified that she did not feel that she had a strong bond with Mother. Child stated that she would ideally like to live with Mother but did not believe that it was the best option right now. Child

testified that if she could no longer visit Mother, she would be upset but that she wanted to do what was best for herself. Finally, Child stated that she wanted to be adopted but still have a relationship with Mother. **See** N.T. Hr'g, 12/2/25, at 14-19.

The court also heard testimony from Bonnie Campbell, Agency caseworker. Ms. Campbell testified that Child's behavior and mental health has deteriorated significantly since the last hearing and that Child has had safety interventions, intensive supervisions, and self-harming incidents at the residential treatment facility. She further testified that prior to the last hearing, Mother only visited Child one time at Hoffman Homes over the course of a year. Ms. Campbell informed the court that since the last hearing, Mother began visiting Child on a regular basis. Ms. Campbell testified that Mother is currently living with a friend in temporary housing that could not accommodate Child. Ms. Campbell testified that Mother reported having a job but failed to provide any documentation confirming her employment and failed to sign a release for the Agency to speak with her employer. Ms. Campbell further testified that the Agency was unable to verify if Mother was compliant with mental health treatment and medication management. She explained that prior to the last hearing, Mother was not participating in Child's mental health treatment or family therapy but that Mother's participation has improved in the last two months. **See id.** at 22-49.

Finally, the court heard testimony from Mother. Mother testified that she has temporary housing with a friend but is looking for permanent housing.

She testified that she is employed at Ollie's Bargain Outlet, as a customer service associate. Mother explained that she has scheduled an appointment for counseling to begin in a month, which was the first available appointment. Mother testified that she receives medical care from a primary care physician at Wellspan Family Medicine and is prescribed medication for severe depression, anxiety, and post-traumatic stress disorder. Mother explained that she is taking medication "so I quit being so angry. So I quit being so agitated and anxious." *Id.* at 54. Mother testified that she is compliant with taking all of her medicine except her bipolar medicine and her attention deficit hyperactivity disorder medicine because insurance will not cover the cost if the medications are prescribed by a primary care physician and Mother is on a waiting list to see a psychiatrist and receive mental health care.

Mother explained to the court that she was delayed in obtaining stable housing and employment because her ex-husband was "stalking" her and "calling everywhere" to thwart her progress until the court granted her request for a protection from abuse order against him. *Id.* at 65. Mother explained that she wanted to continue to work towards reunification with Child, testifying: "I can't say I'm going to be perfect. And by what [my attorney] had told me out in the hallway, [Child] don't want to come with me. And I just want what's best for my child. I don't want to see her hurt anymore. I don't want to hurt anymore." *Id.* at 72-73. Mother informed the court, "I wasn't always a bad mom" and testified that she wants Child "[t]o be happy. To be the child that she wants to be." *Id.* at 73-74. When asked if she was

able to provide that for Child, Mother answered, "When I'm on medication. When I have a house." *Id.*

At the conclusion of the hearing, the court found that it was in Child's best interest to change her permanency goal from reunification to adoption.

Mother timely appealed. Both Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issues for our review:

1) The court erred by changing the permanency goal from reunification to adoption as same was not supported by clear and convincing evidence, a standard that requires "evidence that it so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."

2) The court err[ed] in entering a goal change when insufficient evidence was provided as to the lack of harm [Child] would suffer by severing her bond with her mother.

3) The goal change to adoption was not justified in that [the Agency] has not been able to identify any possible adopting family. To change the goal to adoption (and to cease and desist continuing significant steps toward reunification) serves no purpose for permanency for [Child].

4) The court erred by breaching an agreement entered in court whereby the previous hearing was continued to allow [Mother] to show significant progress as to numerous matters including but not limited to her employment status, mental health treatment and most significantly to show dedication to her daughter, and despite [Mother] overwhelmingly succeeding at such, the court totally and unequivocally disregarded the agreement and actions, and changed the goal from reunification to adoption.

Mother's Br. at 6 (reordered for ease of disposition; some capitalization omitted).

\* \* \*

We review a trial court's decision to change a child's permanency goal to Adoption for an abuse of discretion. ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). In order to conclude that the trial court abused its discretion, this Court "must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record." ***Interest of H.J.***, 206 A.3d 22, 25 (Pa. Super. 2019) (citation omitted). Our standard of review in dependency cases requires this Court "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." ***R.J.T.***, 9 A.3d at 1190.

This Court is "not in a position to make the close calls based on fact-specific determinations." ***Id.*** Rather, "we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan." ***Id.*** Notably, even if this Court "would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." ***Id.***

The overarching purpose of the Juvenile Act, which governs goal change requests, is "[t]o preserve the unity of the family whenever possible or to

provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b)(1). At each dependency review hearing, the trial court must consider, *inter alia*, the continuing necessity for and appropriateness of the child's placement, the extent of compliance with the permanency plan, the extent of progress made toward alleviating the circumstances which necessitated the child's placement, the appropriateness and feasibility of the current placement goal for the child, the likely date the goal might be achieved, and the child's safety. 42 Pa.C.S. § 6351(f).

The focus of goal change proceedings, like all dependency proceedings, is on "the safety, permanency, and well-being of the child and the best interests of the child must take precedence over all other considerations." *H.J.*, 206 A.3d at 25. "The parent's rights are secondary in a goal change proceeding." *In re R.M.G.*, 997 A.2d 339, 347 (Pa. Super. 2010) (citation and internal quotation marks omitted). The Agency has the burden to show that a goal change would serve the child's best interests. *Id.* If reunification with the child's parent or guardian is not in the child's best interest, the trial court may determine that adoption is the appropriate permanency goal. *H.J.*, 206 A.3d at 25; 42 Pa.C.S. § 6351(f.1)(2). Notably, "[a]doption may not be an appropriate permanency goal if severing an existent parent-child bond would have a detrimental effect on a child." *H.J.*, 206 A.3d at 25. Further, "[b]ecause the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan." *R.M.G.*, 997 A.2d at 347.

This Court has held that permanency should be completed within 18 months. **H.J.**, 206 A.3d at 25. "A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **In re Adoption of M.E.P.**, 825 A.2d 1266, 1276 (Pa. Super. 2003) (citation omitted). "Thus, even where the parent makes earnest efforts, the court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **R.M.G.**, 997 A.2d at 347 (citation and internal quotation marks omitted).

\* \* \*

In her first two issues, Mother avers that the Agency failed to present clear and convincing evidence to change Child's permanency goal from reunification to adoption. Mother's Br. at 7. Mother argues that the court failed to consider testimony that in the two months preceding the goal change hearing, Mother regularly visited with Child, attended family therapy sessions, obtained employment, secured a counseling appointment, and was consistently taking medication prescribed by her primary care physician. **Id.** at 8-10. Mother asserts that she "clearly demonstrated she was fully prepared to have her daughter returned to her care in the near future, and that she was fully engaged in her daughter's care and treatment needs." **Id.** at 10. Mother also argues that the record is devoid of evidence regarding whether Child and Mother share a bond. **Id.** at 14. Mother's claims lack merit.

As stated above, when deciding whether to change a child's permanency goal, the focus is on the child's best interest rather than the parent's compliance and hopes for the future. A court must consider the Section 6351 factors to determine what is in a child's best interest, as the trial court did in this case.

In changing Child's permanency goal from reunification to adoption, the trial court placed great weight on Child's preference to be adopted. Based on Child's *in camera* testimony, the court found: "[C]hild concluded that it was in her best interests for her permanency goal to be changed to adoption. She was aware that such a change would mean that she would no longer be working toward return to her mother's care and that discharge planning would include locating a foster family that would be a permanency resource." Trial Ct. Op. at 22-23. The court further found, "[C]hild had the benefit of the support and guidance of her GAL, legal counsel, and therapeutic staff from her residential placement facility. Her position was well-reasoned and mature." *Id.* at 22-23. Notably, the court also credited Child's testimony that she does not have a strong bond with Mother. *Id.* at 24.

In determining a disposition that was in Child's best interest, the trial court also considered the fact that "[C]hild has significant mental health issues that affect her behavior and lead to threats and acts of self-harm. She has a history of becoming defiant, violent and aggressive in the home." *Id.* at 24-25. The court placed great weight on Child's need for consistent mental health services and Mother's ongoing refusal to facilitate those services. The court

opined: "[Child] requires considerable, consistent mental health services and the support of adults and caregivers who see the critical need for these necessary services. Mother has demonstrated over the history of this case that she is either unwilling or unable to commit to [C]hild's mental health treatment over the long haul — likely because of her own untreated mental health issues." *Id.* at 25.

Mother argues that the court failed to consider her progress in the 60 days leading up to the goal change hearing, but the record belies those claims. Based on testimony from both Ms. Campbell and Mother, the trial court recognized that Mother was partially compliant with her court-ordered objectives and found: "[t]he record demonstrates that for a period of approximately 60 days between the October 3, 2025 hearing and the December 2, 2025 hearing, Mother demonstrated some level of compliance with many of the [c]ourt's directives." *Id.* at 20. However, the court placed greater weight on Mother's past non-compliance than Mother's 60-day period of partial compliance. The court credited Ms. Campbell's testimony that Mother made little to no progress towards her objectives prior to October 3, 2025. Moreover, the court considered that Child had been dependent for more than 46 months and had been in the custody of the Agency for more than 18 of the last 22 months. The court opined:

> Because of [Mother]'s track record and past noncompliance, we
> have real concerns that the 60 days' of compliance were nothing
> more than a honeymoon period that will quickly devolve once
> again to noncompliance. Unfortunately, because of the length of
> time the child has been in the care of the Agency, we simply do

not have the luxury of any more time to wait to see if Mother's 60 days' of compliance can grow to 90, 120, 180 and then a lifetime commitment to both her daughter's and her own wellness.

*Id.* at 24.

The court considered Child's preference to be adopted, Child's need for consistent mental health services, and Mother's history of failing to comply with Child's recommended mental health services and found that changing Child's permanency goal from reunification to adoption was in Child's best interest. The record supports the trial court's findings and we decline to reweigh the evidence or usurp the court's credibility determinations. Accordingly, we discern no abuse of discretion.

* * *

Mother next avers that the court abused its discretion when it changed Child's permanency goal from reunification to adoption because the Agency has not yet identified an adoption resource. Mother's Br. at 13. This claim lacks a legal basis.

This Court has clarified that the "termination statute does not require children to be placed in a pre-adoptive home as a precondition to termination of parental rights." *In re K.C.F.*, 928 A.2d 1046, 1054 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511). Likewise, Mother fails to cite any legal authority that requires a child to be placed in a pre-adoptive home prior to changing the permanency goal from reunification to adoption. Here, the trial court emphasized that prior to the goal change hearing, Child did not express a desire to be adopted and the Agency was, therefore, involved in concurrent

permanency planning. The court opined: "until the December 2025 hearing, the child had no interest in being adopted. The child's consent is required for her adoption. 23 Pa.C.S. §2711(a)(1). With the goal change, the Agency can meaningfully work on locating a permanency resource for the child." Trial Ct. Op. at 24. We discern no error.

* * *

In her final issue, Mother avers that the court "erred by breaching an agreement entered in [c]ourt whereby the previous hearing was continued to allow [Mother] to show significant progress as to numerous [court-ordered objectives.]" Mother's Br. at 11. Mother mischaracterizes the court's actions.

The court did not enter into an "agreement" with Mother. Rather, after hearing *in camera* testimony from Child that she did not wish to be adopted, the court granted the Agency's request for a 60-day continuance of the scheduled goal change hearing. The court then addressed Mother and stated on the record, "I want to spell it out for you very clearly the things that I will be looking for in order to decide if the Agency's goal should be changed from adoption to reunification." N.T. Hr'g, 10/3/25, at 33. The court once-again articulated Mother's court-ordered objectives. Mother argues that she "relied on this and complied" and, therefore, the court breached its "agreement" when it changed Child's permanency goal to adoption. Mother's Br. at 12.

As explained above, the record does not support Mother's representation. Moreover, Mother offers no legal authority to support her

claims that a trial court can enter into an agreement with a party appearing before it. For those reasons, we reject this claim of error.

* * *

In conclusion, the trial court did not abuse its discretion when it changed Child's permanency goal from reunification to adoption. The record supports the trial court's findings, and we decline to reweigh the evidence. Accordingly, we affirm.

Order affirmed.
Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/12/2026